[Civ. No. 13275. Third Dist. Oct. 4, 1972.]

JAMES J. CECKA, Plaintiff and Respondent, v.
BECKMAN & CO., INC., et al., Defendants and Appellants.

**COUNSEL**

Mertz, Adams, Horstmann & Funke for Defendants and Appellants.

Guthrie & Wright and Jerry L. Guthrie for Plaintiff and Respondent.

## OPINION

JANES, J.—Defendants Beckman & Co., Inc. (a corporate brokerage firm dealing in securities and commodities), and Jack Vaughn and Harry Evans (two of its account representatives) appeal from a judgment awarding plaintiff damages in the amount of $5,449.52 after nonjury trial of a negligence action for losses sustained by plaintiff while defendants were handling his account.

### SUMMARY OF THE FACTS

Plaintiff is a certified public accountant and licensed real estate broker, with degrees in business administration, accounting, and law. He has invested in the stock market profitably since 1951. Prior to the events herein described, however, he had not engaged in any commodities transaction.

Having made a study of the corn market, plaintiff decided in the fall of 1968 to invest in that commodity. On September 11, 1968, he opened a margin account with an $8,000 deposit at the Sacramento office of defendant Beckman & Co., Inc. (hereinafter, "Beckman"), where he was assisted by defendants Vaughn and Evans, who were commodities specialists. At the same time, plaintiff signed a "Customer's Margin Agreement" which stated in relevant part as follows: "You [Beckman] may, whether or not a margin call has been made, enter 'stop' orders in my account . . . or take any other steps you may deem desirable, to liquidate all or any part thereof . . . without notice . . . when margins, in your judgment, are insufficient for your protection, or . . . upon my failure fully to respond to any margin call made by you . . . . I will remain liable for and will promptly pay any deficiency remaining in my account or accounts."

From September to the end of November 1968, when he withdrew the balance of his account, plaintiff bought and sold corn through Evans, representing Beckman. Plaintiff was solely responsible for the decisions to buy and sell.

Plaintiff did not return to Beckman's office until February 1969. In the interim, plaintiff had analyzed the cattle, soy bean meal, and frozen orange juice markets and had determined to "take a position" (i.e., invest) in those commodities. He saw Evans on February 3, instructed him to sell short in all three commodities, and deposited $5,100 to cover the margin. Although plaintiff subsequently traded in soy bean meal and frozen orange juice, it was the cattle transactions which gave rise to this litigation.

Plaintiff emphasized to Evans on February 3 that, of the $5,100 deposited, plaintiff was unwilling to risk losing more than $2,100 in cattle contracts, and that Beckman "had to sell it out" (i.e., close out those contracts) before any loss occurred in excess of that amount. A cattle contract is the trading unit used on the Chicago Mercantile Exchange, where cattle were traded by Beckman. Cattle are traded on a "contract" basis, not by total poundage, but a "contract" represents a standard poundage which is set by the Chicago Mercantile Exchange. The poundage may vary from time to time, at the direction of that Exchange.

Plaintiff had determined that he would invest in April cattle (i.e., live cattle to be delivered in April 1969). Each contract of April cattle represented 25,000 pounds, a fact independently known by plaintiff on February 3. The "price" of April cattle contracts (i.e., the minimum margin as required by the Chicago Mercantile Exchange) was $300 per contract. Accordingly, at plaintiff's direction, Evans used the allotted $2,100 on February 3 to sell short seven contracts of April cattle for plaintiff's account. The decision to take that position was that of plaintiff alone as a result of his independent analysis without prior consultation or advice from defendants.

Since plaintiff had sold April cattle short on February 3, to make a profit he would have had to be able to *buy* April contracts at a lower price between February 3 and the April delivery date. However, between February 3 and March 17, 1969, the price of cattle rose, so that plaintiff was faced with a loss. He decided to attempt to recoup his loss by terminating his position (i.e., ending his investment) in April cattle and by investing at the same time in October cattle in the hope that the price of October cattle would later go down. The decision to do so was made solely by plaintiff as a result of his independent analysis and not in reliance on any recommendation from defendants. Accordingly, on March 17 plaintiff telephoned Vaughn (Evans was ill), instructed Vaughn to buy seven contracts of April cattle to fulfill the February short sale, and requested him to "maintain my [plaintiff's] same relative position" by selling October cattle short. Plaintiff did not tell Vaughn to maintain plaintiff's same *dollar* or *poundage* position, nor was there any evidence that plaintiff specified the *number* of October contracts which should be sold short.

On March 17, for plaintiff's account, Vaughn bought seven April cattle contracts and sold short *seven* October contracts. However, unbeknownst to plaintiff or to anyone in Beckman's Sacramento office (including Evans and Vaughn), the Chicago Mercantile Exchange had revised the poundage for October cattle contracts from 25,000 to 40,000 and had, as a conse-

quence, also changed the minimum margin required for October contracts from $300 per contract to $400. In September 1968 the Chicago Mercantile Exchange had given written advance notice of these changes to its membership (including Beckman); indeed, the Exchange notice had announced that the changes to 40,000 pounds and $400 per contract would be effective with *August* 1969 cattle contracts. Beckman's margin department in Lodi had itself given advance publicity in its publications to the poundage and margin changes. The evidence (including the testimony of Beckman's general manager) showed, and the trial court in effect found, that the changes should have been known to Vaughn and Evans at the Sacramento office prior to Vaughn's short sale of seven October contracts on March 17.

As a result of the March 17 short sale of October contracts, the minimum margin deposit required in plaintiff's account increased by $700 (the difference between seven April contracts at $300 each, and seven October contracts at $400 each). The purchase of the seven April contracts on the same date had been at a loss and had reduced plaintiff's account to an amount ($1,785) which would still have been sufficient to cover the margin if Vaughn had sold short four October contracts instead of seven. Because the account could not cover a margin of $2,800 (seven October contracts at $400 each), Beckman's margin department in Lodi placed a margin call of $1,015 on plaintiff's account on March 20, 1969, and advised the Sacramento office of the call the same day.

Vaughn and Evans immediately notified plaintiff of the margin call and told him he must pay it. Plaintiff, not knowing of the poundage and margin changes, replied that he did not understand why his account was insufficient to meet the margin on the October contracts, and demanded an explanation. Vaughn and Evans did not know why the call had been made either, so Evans contacted Beckman's margin department in Lodi, at which time Evans and Vaughn first learned of the poundage and margin increases for October contracts. Upon being informed of the changes, plaintiff told Evans and Vaughn that, in plaintiff's opinion, Beckman had not followed plaintiff's instructions, and that to maintain plaintiff's "same relative position," Beckman should have sold short only four October contracts on March 17, not seven, since four October contracts at 40,000 pounds each would have come closest in total poundage (160,000) to the total poundage (175,000) of the seven April contracts at 25,000 pounds each. Plaintiff expressed the view that Beckman must charge three of the sales to its own account; he did not make any deposit in response to the margin call.

Beckman was required by the Chicago Mercantile Exchange to advance

sufficient funds there to meet the call. Accordingly, on March 24 and 25, 1969, Beckman invoked the September 11 margin agreement and terminated plaintiff's position in October cattle by buying seven contracts of October cattle for plaintiff's account without his consent (three contracts on March 24, and four the next day). On March 24 and 25, the price of cattle was even higher than it had been at the time of the March 17 short sale; as a result, plaintiff was charged with a loss in October cattle, and his account was completely depleted when the seven contracts were purchased on March 24 and 25.

## THE LEGAL RELATIONSHIP BETWEEN THE PARTIES

"It is well settled that a broker *in executing an order* for a customer acts as the latter's agent in the transaction." (*Griffin* v. *Payne* (1933) 133 Cal.App. 363, 371 [24 P.2d 370] (italics added); see also, *Black* v. *Shearson, Hammill & Co.* (1968) 266 Cal.App.2d 362, 367 [72 Cal.Rptr. 157].) The law imposes upon an agent the duty to exercise ordinary care to communicate to his principal knowledge acquired in the course of his agency with respect to material facts which might affect the principal's decision concerning a pending transaction entrusted to the agent. (See *Walston & Co.* v. *Miller* (1966) 100 Ariz. 48, 51-52 [410 P.2d 658, 660-661]; *Leuzinger* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* (Mo. 1965) 396 S.W.2d 570, 576; *Robinson* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* (N.D.Ala. 1971) 337 F.Supp. 107, 110-111, affd. *per curiam* (5th Cir. 1972) 453 F.2d 417; cf. *Rattray* v. *Scudder* (1946) 28 Cal.2d 214, 223 [169 P.2d 371, 164 A.L.R. 1356]; *Spaziani* v. *Millar* (1963) 215 Cal.App.2d 667, 684 [30 Cal.Rptr. 658]; *Fisher* v. *Losey* (1947) 78 Cal.App.2d 121, 125 [177 P.2d 334].)

"A broker is not liable for a mere mistake in judgment *which does not result from a failure to know . . . that which a person of ordinary prudence under similar circumstances would know. . . .*" (12 Am.Jur.2d, Brokers, § 96, p. 848.) (Italics added.) However, " '[a]n agent who violates his duty to use reasonable care, skill and diligence is liable for any losses which his principal may sustain as the result of his negligence or breach of duty.' [Citations.]" (*Timmsen* v. *Forest E. Olson, Inc.* (1970) 6 Cal. App.3d 860, 871 [86 Cal.Rptr. 359].)

## THE FINDINGS

Defendants made a general request for findings of fact, and on this appeal they contend that the trial court failed to find "any duty owed by defendants to plaintiff," a specific breach of that duty, and proximate

cause. When findings were proposed, defendants filed objections, proposed counterfindings, and a request for a special finding—none of which raised the points now asserted. Defendants argue, however, that the allegedly omitted findings were material to the judgment in the case.

It is unnecessary to determine whether the amendment of Code of Civil Procedure section 634 operative January 1, 1969, changed the prior rule that "failure to object to the findings is not a waiver of failure to find on a material issue" (*Millbrae Assn. for Residential Survival* v. *City of Millbrae* (1968) 262 Cal.App.2d 222, 238 [69 Cal.Rptr. 251]; compare, *Williams* v. *Williams* (1971) 14 Cal.App.3d 560, 566, fn. 1 [92 Cal.Rptr. 385] (discussing Code Civ. Proc., § 632)), since defendants' attack on the findings is plainly without merit. The trial court made all the findings which defendants claim were omitted.

Finding No. 50 recites that "Defendants had available to them prior to March 17, 1969, information as to the weight and price increased [*sic*] in October cattle as compared to April cattle" and that "although such information was available to the Defendants, and each of them, they did not communicate this information to the Plaintiff or in any way advise him of the increase in the weights or price of October cattle." Finding No. 51 states that "The change in weight of cattle contracts from 25,000 to 40,000 pounds was a well publicized change and the account broker, MR. EVANS, should have known of this particular change." Conclusion No. 3 is to the effect that "Defendants owed Plaintiff a duty to advise Plaintiff of said change in weight and price and Defendants were negligent in not so informing Plaintiff." Conclusion No. 4 recites that "Defendant did not follow Plaintiff's instructions to 'maintain [the] same relative position' in October cattle as Plaintiff had in April cattle."[1] And finding No. 53 states that "Plaintiff suffered loss in the sum of $5,449.52 as a result of the negligence of Defendants and the failure of Defendants to comply with Plaintiffs instructions. . . ."

Thus there was no omission of the material findings which defendants specify.

## SUFFICIENCY OF THE EVIDENCE

Defendants contend that the evidence was insufficient to show a fiduciary relationship between plaintiff and defendants, since all investment decisions prior to the liquidation on March 24 and 25 were made by plaintiff on his own. They also assert that the evidence failed to show that they owed a

---

[1]Conclusion No. 4 is actually a finding. Its placement among the conclusions is of no moment. (See 4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 323, p. 3127.)

duty to plaintiff to advise him of the changes in weight and price of cattle contracts, or that defendants failed to follow his instructions to "maintain my same relative position." Defendants further claim that the evidence was insufficient to show either that they were negligent or that such negligence was the "sole" and proximate cause of plaintiff's damages.

Since we are of the opinion that the judgment is sustainable on the ground that defendants negligently failed to carry out plaintiff's instructions, it is unnecessary to discuss whether defendants breached any fiduciary duty to communicate material information to plaintiff.[2]

The changes in weight and price (affecting the margin requirements) for October contracts were plainly material to the March 17 transaction. The evidence showed that Beckman's margin department in Lodi had received such information well prior to March 17 and that Beckman's Sacramento office should have been, but was not, aware of it. Defendants contend that they followed plaintiff's instruction to "maintain my same relative position" by selling short the exact number of contracts in October cattle that plaintiff had in April cattle on March 17, 1969. However, the mere fact that on March 17 defendants purchased seven April contracts and sold short the *same number* of October contracts cannot be regarded as compliance with plaintiff's "maintain . . . same relative position" instruction unless one ignores Vaughn's and Evans' negligent unawareness of the poundage and margin changes for October contracts. Defendants' negligence was cumulative. If Beckman's Sacramento office had been aware of those changes (as it should have been), it could not possibly have sold short seven October contracts without realizing that, by so doing, it was going counter to plaintiff's February condition that he did not want to risk losing more than $2,100 in the cattle commodity market.

Implicit in the findings of the trial court is its determination, made upon sufficient evidence, that plaintiff's March 17 instruction to "maintain my same relative position" was a reaffirmation of the condition imposed on February 3 that any risk of loss on plaintiff's cattle investment was not to exceed $2,100.[3] Consequently, defendants' initial negligence concerning the weight and price information carried over into their short sale of the October contracts.

---

[2]Defendants cite *Walston & Co.* v. *Miller, supra,* 100 Ariz. 48 [410 P.2d 658], for the proposition that they had no duty to inform plaintiff of the changes in weight and price of the October contracts in which he was dealing. However, unlike the case at bench, *Walston* did not involve a broker's failure to follow his customer's instructions.

[3]Defendants did not question the meaning of the March 17 instruction either by objection to the findings or by request for a special finding.

Defendants' negligence need not have been the "sole" proximate cause of plaintiff's damage to be actionable. (See 2 Witkin, Summary of Cal. Law (7th ed. 1960) Torts, § 286, p. 1485.) Contrary to the contention in defendants' brief, plaintiff's decision not to comply with the March 20 margin call cannot even be viewed as a concurring cause on any theory that "[u]nder the terms of the Margin Agreement executed by plaintiff, defendants had the right to liquidate the account of plaintiff on his failure to fully respond to a margin call when made." The margin call was the result of defendants' noncompliance with plaintiff's instruction to "maintain [his] same relative position." ■ In Meyer's 1931 treatise on The Law of Stockbrokers and Stock Exchanges and of Commodity Brokers and Commodity Exchanges (§ 135, p. 549), it is pointed out that "[i]f the execution of the order is at variance with the customer's instructions or in contravention to the broker's legal duties, the customer may, at his election, treat it as a nullity, and regard his account as being in the same state as if there had been no execution at all." (To the same effect, see *Kernahan* v. *Wallace* (1933) 263 Mich. 572, 578 [248 N.W. 904, 905-906]; *Drake-Jones Co.* v. *Drogseth* (1933) 188 Minn. 133, 138 [246 N.W. 664, 666]; *Clothier* v. *Beane* (1940) 187 Okla. 693, 698 [105 P.2d 752, 757]; *Mandeville* v. *Pooler* (1938) 60 R.I. 273 [198 A. 235]; cf. *Baldwin* v. *Peters, Writer & Christensen* (1960) 141 Colo. 529 [349 P.2d 146]; *R. Baruch and Company* v. *Springer* (D.C. Mun.Ct.App. 1962) 184 A.2d 206.)

Defendants' attack on the sufficiency of the evidence is therefore unavailing. "In reviewing the evidence, an appellate court must resolve all conflicts therein in favor of the respondent . . . , and it must draw all legitimate and reasonable inferences therefrom to uphold the trial court's findings. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court." (*Daum Development Corp.* v. *Yuba Plaza, Inc.* (1970) 11 Cal.App.3d 65, 75 [89 Cal.Rptr. 458].)

The judgment is affirmed.

Richardson, P. J., and Pierce, J.,* concurred.

On November 3, 1972, the opinion was modified to read as printed above.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.