[L.A. No. 30540. Aug. 31, 1978.]

RAMON A. CAMPBELL, Plaintiff and Respondent, v.
SOUTHERN PACIFIC COMPANY et al., Defendants and Appellants.

54

**Counsel**

Morris & Polich, Landon Morris, Morgan, Wensel & McNicholas and Edward L. Lascher for Defendants and Appellants.

Richard C. Voorhies and Al Schallau for Plaintiff and Respondent.

Robert E. Cartwright, Edward I. Pollock, William H. Lally, Stephen I. Zetterberg, Robert G. Beloud, Ned Good, David B. Baum, Arne Werchick, Elmer Low, Sanford M. Gage and Leonard Sacks as Amici Curiae on behalf of Plaintiff and Respondent.

**Opinion**

**MOSK, J.**—This is an appeal by the defendants Southern Pacific Company (Southern Pacific) and White Motor Corporation (White) from a judgment following a jury verdict in an action for personal injuries suffered by plaintiff Ramon Campbell who was employed as a driver for Pacific Motor Trucking Company (PMT). On the night of May 18, 1969,

Campbell was seriously injured during the course of his employment when a tractor he was operating fell off the side of a flatcar being loaded in the Southern Pacific railyard in Los Angeles. The jury returned a verdict of $487,230 against Southern Pacific and White, jointly, and also awarded plaintiff $36,850 against nonappealing codefendants California Hospital (Hospital) and Jan Carpenter Leonard (Leonard) for subsequent and additional injuries sustained by plaintiff when he fell from a hospital table while X-rays were being taken following the accident. For reasons which will appear, we modify and affirm the judgments against White and Southern Pacific.

Southern Pacific engaged its wholly owned subsidiary PMT to move "piggyback" trailers on and off railroad flatcars at its North Mission Street railyard in Los Angeles, and agreed to reimburse PMT for the purchase, repair, and maintenance of equipment used by PMT in the loading and unloading operation. The tractor in question was one of several which PMT had purchased in 1966 from White for use in Southern Pacific's yard. PMT thereafter experienced considerable difficulty with the power steering units of the tractors.

The procedure routinely used in the loading operations was substantially as follows: each trailer was loaded on a flatcar by means of a tractor, which initially pushed the trailer up a ramp onto the bed of a flatcar, and then over a succession of attached cars until the assigned car was reached. After the trailer and tractor were disconnected, the tractor then returned over the adjoining cars, and down the ramp to ground level. Spaces between the cars were bridged by metal endplates. Because these endplates were frequently warped and the flatcars were of varying heights, the tractor's passage over the cars was uneven. Once in position, the trailers were secured to the flatcars by metal saddles. The cars were equipped with six-inch guardrails along their sides.

At the time of the accident, plaintiff, having placed a trailer in position, was returning with the tractor across a flatcar at a speed of approximately five miles per hour. As he approached the end of the train, plaintiff felt the steering wheel pull abruptly to the left and the tractor struck the left guardrail. Plaintiff removed his foot from the accelerator and attempted to steer the vehicle to the right, but the steering wheel jammed and the tractor struck the right guardrail. He then pulled to the left, the steering wheel jerked from his hands, and the tractor ran off the left side of the car landing against another flatcar on an adjoining track. Plaintiff was severely injured.

At trial, plaintiff's expert, Dr. Youngdahl, blamed the accident primarily on a design defect in the tractor's power steering unit. Specifically, he testified that the unit's mountings were not sufficiently strong to withstand shock forces generated by the uneven ride. These stresses, he said, could ultimately produce a deflection in the steering gear resulting from torsional forces exerted during a turning movement, thereby causing the unit's actuator to bind in the direction of the turn. Furthermore, he expressed the view that improper positioning and placement of the steering unit within the vehicle had subjected the unit's hoses to undue rubbing and abrasion, which, in turn, could lead to loss and contamination of the fluid in the steering system. Dr. Youngdahl concluded that the history of power steering repairs and fluid loss on the White tractors had constituted ample notice that there was a malfunction in the steering system.

## I

Plaintiff sued White on a theory of strict liability in tort for the manufacture of a defective product. On appeal, White makes two principal assertions: (1) the jury's answers to certain special interrogatories which were favorable to White cannot be reconciled with the adverse judgment, and (2) the trial court erroneously refused White's proposed instruction on plaintiff's assumption of risk. We conclude that neither contention merits reversal.

In response to special interrogatories which were submitted by the trial court, the jury found that PMT had used and maintained the tractor in an unreasonable manner, and that this unreasonable use and maintenance had "contribute[d] to plaintiff's injury." White contends that these answers compel a judgment in its favor, since they demonstrate the jury's acceptance of White's defense of product misuse. Prior to *Daly* v. *General Motors Corp.* (1978) 20 Cal.3d 725 [144 Cal.Rptr. 380, 575 P.2d 1162], it was established, however, that product misuse was a defense to strict products liability only when the defendant proved that an unforeseeable abuse or alteration of the product after it left the manufacturer's hands was the *sole* reason that the product caused an injury. (See *Hasson* v. *Ford Motor Co.* (1977) 19 Cal.3d 530, 550-551 [138 Cal.Rptr. 705, 564 P.2d 857]; *Cronin* v. *J.B.E. Olson Corp.* (1972) 8 Cal.3d 121, 126 [104 Cal.Rptr. 433, 501 P.2d 1153]; *Self* v. *General Motors Corp.* (1974) 42 Cal.App.3d 1, 7 [116 Cal.Rptr. 575].) Here, there was evidence from which the jury could well have concluded that, assuming arguendo that there was product misuse, a manufacturing or design defect in the tractor *also*

contributed to the accident. Nothing in the answers to the special interrogatories indicates that the jury rejected that view. There is, therefore, no fatal inconsistency between the special findings and the general verdict. (Code Civ. Proc., § 625.)

White's assumption of risk defense is based upon the following evidence: plaintiff and a fellow employee both testified that plaintiff was told when he reported for work on the evening of the accident that the tractor assigned to him had exhibited steering difficulties. Plaintiff observed the tractor contained no red tag, which customarily would have indicated its unsafe condition, but he was advised before first using it that the tractor had been red tagged. Plaintiff further testified that he told his supervisor that he understood the tractor was unsafe and was reluctant to use it. The supervisor reassured him that the vehicle had not been red tagged, and provocatively asked plaintiff, ". . . are you refusing to work?" Plaintiff then operated the tractor and noticed some "sloppiness" in the steering system. The accident occurred about 20 minutes after plaintiff began to load the flatcars.

■ Under the circumstances of this case, we conclude that any error in refusing an instruction on the assumption of risk issue was not prejudicial to White. This result follows from the procedural posture of the case, which we now examine. Relying in part on the same evidence on which White sought to establish plaintiff's assumption of risk, Southern Pacific raised the defense of plaintiff's contributory negligence and obtained appropriate instructions on that issue. By its verdict against Southern Pacific (rendered before our decision in *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393]), the jury necessarily found that no negligent or unreasonable conduct of plaintiff had contributed to his injuries. Under the law applicable at the time of trial herein, the only form of assumption of risk which could be asserted in a strict liability action was the plaintiff's "voluntary and unreasonably proceeding to encounter a known danger, . . ." (*Luque* v. *McLean* (1972) 8 Cal.3d 136, 145 [104 Cal.Rptr. 443, 501 P.2d 1163], quoting *Barth* v. *B. F. Goodrich Tire Co.* (1968) 265 Cal.App.2d 228, 243 [71 Cal.Rptr. 306].)

As we expressed in *Li,* an "unreasonable" assumption of risk is but a variant of contributory negligence. (*Li, supra,* at p. 824.) These principles have particular application to the case before us. The same jury could not, on the same facts, have found that plaintiff's conduct was reasonable, not constituting contributory negligence as to Southern Pacific, but was unreasonable, thus amounting to assumption of risk as to White. The

assumption of risk issue was therefore necessarily resolved adversely to White when the jury rejected Southern Pacific's contributory negligence contention. Under these circumstances, we conclude that it is not reasonably probable that White's proposed instruction on assumption of risk would have produced a result more favorable to White. (*Grey* v. *Fibreboard Paper Products Co.* (1966) 65 Cal.2d 240, 246 [53 Cal.Rptr. 545, 418 P.2d 153]; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

We realize, of course, that multiple defendants are involved and that each defendant is entitled to instructions on, and separate consideration of, every defense available and applicable to it. (*Phillips* v. *G. L. Truman Excavation Co.* (1961) 55 Cal.2d 801, 806 [13 Cal.Rptr. 401, 362 P.2d 33]; see *McNeill* v. *A. Teichert & Son, Inc.* (1955) 137 Cal.App.2d 5, 11 [289 P.2d 595]; 4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 221, subd. (c), pp. 3042-3043; Cal. Jury Instns., Civ. (BAJI) (5th ed. 1969) No. 15.02.) The purpose of this rule is to insure that the jury will distinguish and evaluate the separate facts relevant to each defendant. (*Witkin, supra.*) Here, however, although the case before us involves multiple defendants, only one plaintiff is involved, and it is his conduct to which the defenses relate. Where separate defenses of separate defendants are necessarily based upon the same facts, we must, on appeal, accord the jury's determination of those facts their full logical weight. As we have seen, the jury's implied finding that plaintiff's conduct was not negligent entirely precluded White's assumption of risk defense; the jury could not, on the same facts, have rejected Southern Pacific's defense while upholding White's. Thus, any error in denying White's proffered instruction is harmless, and provides no basis for reversal. (Cal. Const., art. VI, § 13; *People* v. *Watson, supra,* 46 Cal.2d 818, 836.)

Finally, White seeks remand for reduction of the judgment against it. White argues that the jury award of approximately $487,000 *included* damages arising from the subsequent hospital accident; that these damages were also assessed against Hospital and Leonard in a separate judgment; and that the latter judgment has been fully satisfied by the medical defendants. Hence, White urges, it is entitled to a *pro tanto* credit against its own liability. Plaintiff, on the other hand, contends that the two awards represent entirely separate elements of damage, and that no credit is due.

Using a modified form of BAJI No. 14.66, the trial court instructed the jury that, in the absence of contributory negligence, "[i]f . . . defendant

[i.e., White] is [found] liable for the original injury to the plaintiff, he [*sic*] *is also liable*: [¶] 1. For any *aggravation* of the original injury or additional injury caused by *negligent medical or hospital treatment or care* of the original injury. [¶] 2. For any injury sustained in a *subsequent accident* which is a normal consequence of the impaired physical condition and which would not have occurred had the plaintiff's physical condition not ·been impaired." (Italics added.) The jury was further told that Hospital and Leonard were themselves liable for any additional injury negligently inflicted on plaintiff while in their care, but that their liability was limited to the additional injury. (See *Ash* v. *Mortensen* (1944) 24 Cal.2d 654, 657 [150 P.2d 876].)

Plaintiff points to nothing in the record which suggests that these clear instructions were disregarded. The mere fact that separate verdicts were rendered does not necessarily indicate that entirely separate awards were intended. The verdicts returned, reasonably interpreted, appear to be the only means by which the jury could have assessed damages against all responsible parties in accordance with their respective degrees of culpability, as the instructions required.

■ We therefore hold that the joint judgment against White and Southern Pacific *includes* damages arising from the accident suffered by plaintiff while at Hospital. Since the same damages are also represented in the separate judgment against Hospital and Leonard, White and Southern Pacific are entitled to a *pro tanto* credit for the satisfaction of that judgment by the medical defendants. (*Heves* v. *Kershaw* (1961) 198 Cal.App.2d 340, 345 [17 Cal.Rptr. 837]; Rest., Torts, § 885, com. a.)

However, White has misconceived its remedy. The fact that judgment debtors by satisfying one valid judgment have also partially satisfied another does not justify modification of the latter judgment on appeal. Rather, White must resort to the usual statutory procedures for obtaining or compelling an acknowledgment that the judgment against it has been satisfied; these are matters within the original jurisdiction of the trial court. (Code Civ. Proc., § 675.) We therefore decline to order the requested modification.

## II

■ Plaintiff's case against Southern Pacific was tried on the theories that (1) Southern Pacific's negligence, and (2) breach of its duties of a "statutory employer" had. proximately caused his injuries. Southern

Pacific contends that there is no support in the record for either theory, and that its motion for judgment notwithstanding the verdict should have been granted. We disagree.

Whether or not Southern Pacific was negligent cannot be determined as an issue of law; it is purely and simply a question of fact. As such it was submitted to the jury under appropriate instructions, and the jury found for plaintiff. Indeed, for emphasis the jury in a special interrogatory found that the negligence of PMT concurred with that of Southern Pacific to produce plaintiff's injuries. This court cannot reweigh the evidence and reach a contrary factual determination.

■ The principles of review which must guide us are elementary. As we said over four decades ago in *Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183], a "reviewing court is without power to substitute its deductions for those of the trial court." More recently *Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925-926 [101 Cal.Rptr. 568, 496 P.2d 480], emphasized that "In resolving the issue of the sufficiency of the evidence, we are bound by the established rules of appellate review that all factual matters will be viewed most favorably to the prevailing party [citations] and in support of the judgment . . . . 'In brief, the appellate court ordinarily *looks only at the evidence supporting the successful party, and disregards the contrary showing.*' (6 Witkin, Cal. Procedure [2d ed. 1971] § 249, at p. 4241.) All conflicts, therefore, must be resolved in favor of the respondent." (Italics in original; also see *Cecka* v. *Beckman & Co.* (1972) 28 Cal.App.3d 5, 14 [104 Cal.Rptr. 374].)

■ In reliance on the foregoing rule, we briefly describe the evidence supporting the successful party and disregard any contrary showing. In actuality, however, the following items were basically uncontradicted.

PMT was a wholly owned subsidiary of Southern Pacific, and was engaged by the latter to load trailers on railroad flatcars at the Southern Pacific yard in Los Angeles. The land and the flatcars were owned by Southern Pacific.

All of the White tractors that were used for loading flatcars at the Southern Pacific yard had the legend "Southern Pacific" painted prominently on the side of the truck. There was no evidence that this publicly proclaimed assertion of control over the tractors was unknown or unauthorized.

All of the White tractors acquired by PMT in 1966 were for exclusive use on the Southern Pacific ramp or the piggyback yard. The tractors were not licensed for general use on the highway.

PMT employees were under Southern Pacific control in that PMT was bound by contract to remove from service any employee who conducted himself in a manner objectionable to Southern Pacific.

In most instances Southern Pacific determined which trailers would be placed on designated cars of the railroad. Southern Pacific would give to plaintiff's foreman loading tickets prescribing the trailers which were to be placed on certain flatcars. On occasions Southern Pacific personnel would direct him to move a PMT trailer from one of the flatcars and onto another.

Southern Pacific was responsible for determining the time the flatcars were to be dispatched. Plaintiff's foreman, in directing PMT truck drivers, was governed by a time schedule furnished to him by Southern Pacific.

Southern Pacific agreed to reimburse PMT for equipment purchased for use in the trailer-flatcar operations and for repair and service of the equipment. Pursuant to that agreement PMT purchased and used the White tractors, including the tractor involved herein.

Southern Pacific agreed to reimburse PMT "for repairing and servicing foreign line equipment, loading or unloading facilities or equipment, modification of equipment, experimental work, testing, labor, materials or supplies used for protection of cargo, including bulkheading, bracing, tiedowns, or other dunnage to properly secure trailer loads for rail movement: . . ."

The Southern Pacific flatcars, onto which the trailers were loaded, were not level. Because the flatcars differed in height by several inches, the endplates were frequently warped. The differences in height between the flatcars subjected the tractor steering systems to shock forces which demanded particularly strong mountings. Tortional forces exerted during a turn caused deflection in the power steering gear of the tractors, and the power steering actuator tended to bind. With the actuator bound, the power steering would stick in the direction of the bind. Additionally, improper placement of the power steering unit subjected its hoses to rubbing and abrasion. Loss of fluid from a leaking hose would cause

extra stress on the system and increase the likelihood that contaminants might enter the system. The long history of power steering repair and fluid loss on the 10 White tractors, including the vehicle involved herein, gave notice to PMT and Southern Pacific that damage was being caused to the system.

An expert witness for plaintiff found the irregular height of the flatcars significant, as it related to the steering mechanism of the subject White tractor. The difference in height of the railroad cars—as much as 12 inches—was important in that the total vehicle was subjected to shock forces that demanded more rigid mounting of the steering mechanism than would be needed if there were no shock forces exerted. He further declared the shock forces that result from the tires hitting an object such as the safety rail causes deflection, and the deflection in the actuator occurred because of the way the power steering unit was suspended in the tractor.

Whenever an unsafe condition was discovered anywhere on the railroad cars by plaintiff's foreman he would report the condition to Southern Pacific; he had no authority to correct defects. The foreman observed steel plates that were bent on a number of Southern Pacific flatcars. He had made requests to the railroad personnel for repair of these and other defects.

There was testimony by two witnesses that no representatives of Southern Pacific ever came to PMT facilities in order to inspect the White tractors.

Neither PMT nor Southern Pacific published any safety regulations relating to the loading or unloading of piggyback trailers aboard railroad cars. The yard operated without any safety regulations in printed form.

If not singly, then certainly cumulatively the foregoing items of substantial evidence add up to sufficient facts to justify the jury verdict and the judgment that Southern Pacific, concurrently with PMT, was negligent.

Finally, plaintiff commendably calls to our attention that, because of a clerical error, the judgment below was not diminished by the amount of workers' compensation benefits already paid to plaintiff by his negligent employer, PMT. (See *Witt* v. *Jackson* (1961) 57 Cal.2d 57, 73 [17 Cal.Rptr. 369, 366 P.2d 641].) The undisputed amount of these benefits is

$39,398.39. Accordingly, we reduce the judgment by that amount. (See 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 532, p. 4477.)

The judgments against White and Southern Pacific are affirmed, with the modification noted in the preceding paragraph. Plaintiff shall recover his costs on appeal.

Bird, C. J., Tobriner, J., and Jefferson, J.,* concurred.

**RICHARDSON, J.,** Concurring and Dissenting.—I concur in that portion of the majority opinion which affirms, with indicated modifications, the judgment against defendant White Motor Corporation (White). I respectfully dissent, however, from the majority's conclusion that the judgment against White's codefendant Southern Pacific Company (Southern Pacific) is supported by substantial evidence. In my opinion the majority's attempt to substitute evidentiary volume for evidentiary relevance is unavailing. Whether viewed "singly" or "cumulatively," the random record of miscellany cited by the majority fails to establish any basis for Southern Pacific's liability, either through its own direct negligence, or through its relationship with its subsidiary, Pacific Motor Trucking Company (PMT).

I fully accept the well settled rules that appellate review of the sufficiency of the evidence is limited, and that all presumptions favor a jury's verdict. Nonetheless, in order to sustain a judgment against appellate scrutiny, the supporting evidence must at least be "of ponderable legal significance" and "must actually be 'substantial' proof of the essentials which the law requires in a particular case." (*Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54].) As I explain, the majority points to no such evidence against Southern Pacific.

Throughout the trial plaintiff's principal contention was that the defective design and improper maintenance of the White tractor's steering mechanism were the cause of his injuries. No evidence whatever appears in the record that any negligent acts or omissions of Southern Pacific in the maintenance of its railyard, rolling stock, or endplates contributed to the accident. There was testimony that the surfaces and elevation of the flatcars in question were uneven, and that Southern Pacific, on occasion, had used "bent" endplates. However, the testimony

---

*Assigned by the Chairperson of the Judicial Council.

of plaintiff's expert, Dr. Youngdahl, on this evidence established only that the tractor's power steering systems should have been strong enough to withstand the stresses produced by the loading operations, a fact the majority also appears to concede.

The majority states that a plaintiff's foreman had brought the "defective" endplates to Southern Pacific's attention and had recommended their repair. If true, this would be at least some evidence that continued maintenance of the endplates in a warped condition was direct negligence on the part of Southern Pacific. With due respect, however, I suggest that the majority seriously mischaracterizes the record. The foreman testified generally that he reported to Southern Pacific "defects" in its equipment when he observed them; the only example of a "reported defect" that he could recall, however, was a damaged brake arm. In another portion of his testimony, the foreman acknowledged observing uneven rail car heights and bent endplates; however, he never characterized these conditions as defective or unsafe, nor did he testify he had reported them to Southern Pacific.

Plaintiff, in short, never established on this record how Southern Pacific should have managed differently any property under its direct control in order to avoid the mishap. Since plaintiff's *complaint* emphasized the theory that his injury had been caused by Southern Pacific's negligent maintenance of its *railroad cars*, we must deem significant his omission to introduce any evidence on this issue at trial.

The record reflects that PMT had contracted with Southern Pacific to load and unload Southern Pacific's trains in the latter's Los Angeles yard, and that PMT's negligence in maintaining the subject White tractor was a proximate cause of plaintiff's injuries. Generally, liability is not imposed upon a party for the negligence of an independent contractor engaged by the party. (*Williams* v. *Fairhaven Cemetery Assn.* (1959) 52 Cal.2d 135, 139 [338 P.2d 392]; *Green* v. *Soule* (1904) 145 Cal. 96, 99 [78 P. 337]; *Merritt* v. *Reserve Ins. Co.* (1973) 34 Cal.App.3d 858, 881 [110 Cal.Rptr. 511]; *West* v. *Guy F. Atkinson Constr. Co.* (1967) 251 Cal.App.2d 296, 299 [59 Cal.Rptr. 286]; see *Golden* v. *Conway* (1976) 55 Cal.App.3d 948, 956-957 [128 Cal.Rptr. 69].) The majority has accepted plaintiff's argument that an exception to the foregoing general rule of nonliability should be recognized in the instant case because Southern Pacific (1) exercised detailed control over the manner in which PMT performed its work, and (2) selected and furnished to PMT the defective vehicle. (*McDonald* v. *Shell Oil Co.* (1955) 44 Cal.2d 785, 791 [285 P.2d 902]; *Hard*

v. *Hollywood Turf Club* (1952) 112 Cal.App.2d 263, 274-275 [246 P.2d 716].) In my opinion the argument cannot be sustained.

PMT's loading operations necessarily conformed to Southern Pacific's train schedules and business needs, thereby governing time, place and circumstance of the loading process. Furthermore, Southern Pacific, under its contract with PMT, could cause the discharge of PMT employees and had the right to inspect PMT's books.

However, ". . . '[t]he general supervisory right to control the work so as to insure its satisfactory completion in accordance with the terms of the contract does not make the hirer of an independent contractor liable for the latter's negligent acts in performing the details of the work . . . .' " (*Williams* v. *Fairhaven Cemetery Assn., supra,* 52 Cal.2d at p. 139.) Here, and this is crucial, the contract gave Southern Pacific no right to supervise PMT's *methods* of operation, nor does the record suggest that Southern Pacific in any manner attempted to exercise such supervision or control. (*McDonald, supra,* at p. 791.) There is, for example, no evidence that Southern Pacific selected the tractor to be used in a particular operation, governed shift schedules, or designated how PMT employees were to be deployed; all these functions were apparently retained by PMT.

No Southern Pacific personnel were at the scene in either an operational or supervisorial capacity when the accident occurred, nor was there any purpose which would have been served by their presence. The evidence that PMT was Southern Pacific's wholly owned subsidiary and that most of PMT's work involved Southern Pacific's rolling stock adds nothing to plaintiff's case. The fact that PMT's tractors displayed the words "Southern Pacific" tells us nothing about the critical right to, or exercise of, *control* or supervision over the operational details of the work. Significantly, plaintiff and the majority studiously refrain from contending that PMT's close corporate relationship with Southern Pacific makes either entity the "alter ego" of the other. Unaided by this doctrine, evidence of that relationship, standing alone, permits no inference that Southern Pacific *in fact* controlled the activities which led to plaintiff's injury. Southern Pacific neither had the contractual *right* to exercise control, nor attempted *in fact* to assert any control over the loading operations.

Nor does the record permit any inference that Southern Pacific was directly responsible for the purchase or maintenance of the defective tractor. Under the contract, Southern Pacific, as part of its costs of PMT's

services, agreed to and did reimburse PMT for the purchase and maintenance of PMT's equipment. However, this does not mean that Southern Pacific itself "furnished" or maintained the equipment. In many business arrangements there are contracts in which parties guarantee some or all of a contractor's costs of operation; contractual provisions for reimbursement and "cost plus" formulae are a frequent and familiar commercial means of achieving this goal.

At trial all the evidence was to the effect that PMT was solely responsible for the selection, purchase, repair, maintenance and deployment of the tractors. There is no suggestion in the record that Southern Pacific or its employees were aware of any defect which produced plaintiff's injuries.

In summary, the record is devoid of evidence that Southern Pacific had either actual or potential control over the details of the work in question, or that it negligently furnished defective equipment or created any working conditions which caused plaintiff's injuries.

I would affirm the judgment against White, and would reverse the judgment against Southern Pacific with directions that its motion for judgment notwithstanding the verdict be granted.

Clark, J., and Manuel, J., concurred.

Appellants' petition for a rehearing was denied September 27, 1978. Clark, J., Richardson, J., and Manuel, J., were of the opinion that the petition should be granted.