Filed 1/3/14  Nguyen v. Guerrero CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| BRANDON NGUYEN et al., | |
| Plaintiffs and Appellants, | G047892 |
| v. | (Super. Ct. No. 30-2011-00474126) |
| RICHARD A. GUERRERO, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Geoffrey T. Glass, Judge.  Affirmed.

Thon Beck Vanni Callahan & Powell and Daniel P. Powell for Plaintiffs and Appellants.

Schmid & Voiles, Denise H. Greer and Sidney J. Martin for Defendant and Respondent.

\*　　　　\*　　　　\*

Plaintiff Brandon Nguyen filed a complaint against Dr. Richard A. Guerrero and others on behalf of himself and, as guardian ad litem, his daughter Sandra (the Nguyens). The complaint alleged Vivian Vo, Nguyen's wife and Sandra's mother, died as a result of medical malpractice. The jury found Dr. Guerrero was not negligent in his treatment of Vo.[1] The Nguyens contend the evidence does not support the verdict and judgment, claiming Dr. Guerrero's expert incorrectly defined the standard of care for the jury. We affirm.

I

FACTS

We set forth the facts in accordance with the standard of review. (See *Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429.) This case involves the unfortunate death of a 29-year-old woman taken by ambulance to the Garden Grove Medical Center on April 25, 2010, due to "a massive upper gastrointestinal bleed" apparently caused by an almost daily use of of nonsteroidal anti-inflammatory drugs (NSAIDS) and the presence of H. pylori bacteria. At the time she was transported to the hospital, she had been vomiting blood. In the hospital, it was noted she was also passing blood through her rectum. Vo was critically ill and had a chronic underlying disease: inflammatory polyarthtitis involving a number of joints. She also had Behcet's disease with difficult to heal ulcers in her mouth. Additionally, she was diagnosed with vasculitis, "a harbinger of poor healing."

Dr. Guerrero was on-call and responded to the emergency room between 10:30 and 11:00 p.m. Dr. Chung,[2] the gastrointestinal physician, was in the process of performing an endoscopy in an effort to determine the cause of the bleeding when Dr. Guerrero arrived. There was too much blood in the stomach for the camera to see into

---

[1] Dr. Guerrero is the only defendant appearing in this appeal.

[2] Dr. Chung's first name does not appear in the record on appeal.

2

the duodenum, the section of the small intestine connected to the stomach. Dr. Chung was of the impression that the bleeding was coming from the duodenum. When Dr. Chung said he could not stop the bleeding through endoscopic intervention, Dr. Guerrero decided to operate. Vo was bleeding to death. At that point she had received a number of blood transfusions. Additionally, there was a presumptive diagnosis of disseminated intravascular coagulation (DIC), a reduction of the blood's ability to clot. DIC was most likely caused by her massive loss of blood, but NSAIDS also affect clotting ability.

Vo was in shock when she was taken into surgery. Dr. Guerrero first performed a gastrotomy, cutting into Vo's stomach and removing half a liter of clotted blood. Dr. Guerrero performed the gastrotomy because there was so much clotted blood in Vo's stomach it could not be evacuated by suction. He then repaired the bleeding duodenal arterial vessel in the second portion of the duodenum. In an effort to help the duodenum heal, Dr. Guerrero sealed off the pylorus, the opening at the base of the stomach, to prevent stomach fluids from entering the surgically repaired duodenum. Had he not sealed off the pylorus from the stomach and gastric acid from the stomach entered the pylorus and eaten through the sutures within 24 to 48 hours, gastric and intestinal content could have leaked into the abdominal cavity, resulting in a potentially life-threatening situation.

The ulcer, just shy of an inch in diameter, had apparently been there for a significant period of time. Dr. Guerrero biopsied the ulcer because it had an "extremely abnormal" appearance." Whereas most of a gastrointestinal tract is red or pink, the biopsied area was yellowish, and had a translucent, rice paper-like appearance. Upon removing the biopsied piece, Dr. Guerrero saw that the sample was not part of the duodenum wall at all, but was a replacement wall. He said it appeared the duodenum had perforated at some earlier time and a portion of the mesocolon and the omentum then filled the area. Because he sealed off the duodenum from the stomach, Dr. Guerrero performed a gastrojejunostomy, sewing another portion of the small intestine to the

stomach so the stomach's contents could enter the small intestine.

Later on the morning of April 26, Dr. Guerrero was contacted by the admitting physician who said there appeared to be a fair amount of blood in the JP drain. To Dr. Guerrero that meant bleeding must have developed after the surgery and further surgery was required to determine the source of the bleeding. Dr. Guerrero patched the areas believed to be the sources—the head of the pancreas, where he had observed seeping during the first surgery and an area in the mesocolon reflected away from the duodenum during the first surgery. Dr. Guerrero checked the sutures to the duodenum and those used in the gastrojejunostomy. Neither was bleeding.

Vo was on kidney dialysis the next day when Dr. Guerrero made his rounds. The JP drain was putting out a small amount of drainage, a good sign. The lab test on Vo's blood showed her blood's clotting ability was improving.

While still in the hospital, Vo developed a marginal ulcer and the site of the gastrotomy "seemed to be bubbling air," which meant the wound had not completely healed or had broken down. In a third surgery performed on May 14 by Drs. Coa[3] and Guerrero, Dr. Guerrero found bleeding at a site along the anastomosis. Dr. Guerrero said the gastrojejunostomy was intact, as was the previous duodenum repair, but "'there was a significant amount of clot[ted blood] in the right upper quandrant.'"

Nguyen asked to have his wife transferred to UCLA Medical Center and she was transferred on May 24. Physicians at UCLA Medical Center operated on her twice (May 25 and June 7) and she died at the medical center on June 9.

The defense expert, Dr. Samuel Wilson, was chief of surgery at the Harbor-UCLA Medical Center in Torrance for 10 years and at the time of trial was the chairman of surgery at the University of California Irvine and chief of surgery at the Veterans Administration in Long Beach. He is board certified in general surgery and vascular

---

[3] Dr. Coa's first name does not appear in the record on appeal.

4

surgery. He has worked as a reviewer for the California Medical Board, and currently sits on four editorial boards of peer review journals. He has published over 400 articles in peer review journals, including articles on the treatment of ulcer disease. Dr. Wilson has performed probably more than 150 ulcer repair surgeries.

Dr. Wilson reviewed Vo's medical records from Garden Grove Community Hospital and UCLA Medical Center, as well as depositions of various physicians, including Guererro and the Nguyens' medical expert, Dr. Leo Gordon. Dr. Wilson testified Dr. Guerrero's actions were not negligent.[4] On cross-examination, the Nguyens' counsel asked Dr. Wilson about the standard of care he used in reaching his conclusion:

"Q And the standard of care that you were measuring him is what a majority of practitioners would do in the community, but ultimately a standard of care is defined by a jury. That was your thought as to how you were measuring Dr. Guerrero's conduct at the time of your deposition.

"A The jury will determine whether or not he met the standard of care, yes.

"Q Do you still believe that the standard of care that you were using, the yardstick that you are using to judge Dr. Guerrero's conduct, is what a majority of practitioners would do in the community?

"A Yes."

Dr. Gordon also reviewed the records from the Garden Grove Community Hospital and UCLA Medical Center and read the depositions of the physicians involved in the case, including the deposition of Dr. Wilson. Dr. Gordon concluded Dr. Guerrero did not comply with the applicable standard of care—"what a reasonable doctor would do in a similar circumstance"—and that failure was a substantial factor in Vo's death.

The court instructed the jury on the applicable standard of care: "A surgeon is negligent if he fails to use the level of skill, knowledge, and care in diagnosis and

---

[4] Additional details of Dr. Wilson's testimony are set forth below in the discussion section.

treatment that other reasonably careful surgeons would use in the same or similar circumstances." (See CACI No. 502.) The jury was provided a special verdict form that divided the issue of Dr. Guerrero's liability into two questions: whether Dr. Guerrero was negligent in his diagnosis and treatment of VO; and, if so, whether his negligence was a substantial factor in causing her death. The jury found Dr. Guerrero did not act negligently. The court entered judgment in favor of defendants and subsequently denied the Nguyens' motion for a new trial.

II

DISCUSSION

The Nguyens argue defendant's expert, Dr. Wilson, stated an incorrect standard of care in a medical malpractice action and, as a result, the jury was required to accept the testimony of their medical expert, Dr. Gordon, who testified Dr. Guerrero's action was negligent. From this premise the Nguyens conclude the evidence was insufficient to support the defense verdict. Not so.

In deciding a sufficiency of the evidence claim, we must view the evidence in favor of the prevailing party below and in support of the judgment. Generally, we review the evidence supporting the prevailing party and disregard contrary evidence. (*Campbell v. Southern Pacific Co.* (1978) 22 Cal.3d 51, 60.) We uphold the judgment if it is supported by substantial evidence, "no matter how slight it may appear in comparison with the contradictory evidence." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631.) But substantial evidence does not mean *any* evidence. (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633.) Evidence is substantial if it is "'reasonable in nature, credible, and of solid value; it must actually be "substantial" proof of the essentials which the law requires in a particular case.' [Citations.]" (*United Professional Planning, Inc. v. Superior Court* (1970) 9 Cal.App.3d 377, 393.) If the judgment is supported by substantial evidence, we must affirm absent the commission of prejudicial error at trial. (See *Pannu v. Land Rover North America,*

6

*Inc.* (2011) 191 Cal.App.4th 1298, 1321-1322 [must affirm award of damages supported by substantial evidence, absent error in admission of testimony on issue].) The Nguyens do not allege prejudicial error.

The Nguyens are correct in claiming their expert testified to the appropriate standard of care and Dr. Guerrero's expert did not. Dr. Gordon stated the applicable standard of care as "what a reasonable doctor would do in a similar circumstance." "[A] physician is required to possess and exercise, in both diagnosis and treatment, that reasonable degree of knowledge and skill which is ordinarily possessed and exercised by other members of his profession in similar circumstances. [Citations.]" (*Landeros v. Flood* (1976) 17 Cal.3d 399, 408.) Dr. Wilson, on the other hand, stated the standard of care as "what a majority of practitioners would do in the community." We do not use the standard referred to by Dr. Wilson because "'we are not permitted to aggregate into a common class the quacks, the young [physicians] who have no practice, the old ones who have dropped out of the practice, the good, and the very best, and then strike an average between them. This method would evidently place the standard too low.' [Citation.]" (*Scarano v. Schnoor* (1958) 158 Cal.App.2d 612, 618.)

The jury was instructed as to the proper standard of care. (CACI No. 502.) Understandably, the Nguyens do not contend the jury used the wrong standard in reaching its verdict.[5] (*People v. Harris* (2013) 57 Cal.4th 804, 842 [court presumes jury followed the court's instruction].)

What they do argue is that as Dr. Wilson misstated the appropriate standard of care and their expert, Dr. Gordon, testified to the correct standard, Dr. Gordon's

---

[5] We note the standard to which Dr. Wilson testified was asked by the Nguyens' counsel in a leading question on cross-examination and counsel did not move to strike the answer or the expert's testimony based on his answer to the question. Arguably the issue has not been preserved. (*In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 984 [failure to object forfeits issue that could have been corrected in trial court].)

testimony was binding on the jury. In so far as the standard of care is concerned, we agree. However, from that premise the Nguyens extrapolate that as Dr. Gordon was the only expert to testify to the proper standard of care and he then testified Dr. Guerrero's actions—the gastrotomy, biopsy, pyloric exclusion, and the gastrojejunpstomy—were not appropriate, the evidence demonstrated Dr. Guerrero's actions were negligent. In Dr. Gordon's opinion, Dr. Guerrero should have located the bleeding ulcer, stopped the bleeding, and closed.

However, the fact that Dr. Guerrero's expert may have misstated the standard of care does not mean the jury was required to accept Dr. Gordon's conclusion that Dr. Guerrero breached his duty of care. The court properly instructed the jury on the standard of care. The Nguyens concede Dr. Wilson qualified as an expert and was competent to testify to what a reasonably prudent physician would have done in treating Vo. The jury was entitled to accept Dr. Wilson's testimony concerning the appropriateness of Dr. Guerrero's actions. Specifically, Dr. Wilson testified the gastrotomy was "absolutely essential" and "a perfectly appropriate first step." Indeed, he said the procedure followed by Dr. Guerrero was "surgery 101." Dr. Wilson said that by opening the stomach and removing the clotted blood, Dr. Guerrero could not only check the stomach to make sure there were no ulcers within, he could also look into the first part of the duodenum, where one would expect to find a bleeding ulcer in a location other than the stomach. The physician who performed the endoscope procedure told Dr. Guerrero he could not see into the duodenum because there was too much blood in the stomach. The jury could reasonably conclude the reason Dr. Guerrero was able to make an incision into the secondary part of the duodenum where the ulcer was located—a place one would *not* normally expect to find a bleeding ulcer—rather than making an incision in the first part of the duodenum where one would normally expect to find an ulcer in the duodenum, was because Dr. Guerrero did the gastrotomy.

8

Dr. Wilson said he understood Dr. Gordon's opinion that having stopped the bleed, Dr. Guerrero should have done nothing else—i.e., Dr. Guerrero should not have performed the pyloric exclusion and the gastrojejunostomy. But Dr. Wilson disagreed with that conclusion. He said the risk of stomach acid entering the duodenum and damaging the repair performed by Dr. Guerrero—an event that if it occurred could have resulted in the release of stomach acid into the abdomen and "could be literally the patient's life"—made the pyloric exclusion medically appropriate. Without the bypass procedure, there would have been an increased risk of a leak to the sutures in the duodenum. The duodenum does not have the same protection the stomach has from acid. The gastrojejunostomy was but the second component of closing off the duodenum from the stomach. By performing that procedure, Dr. Guerrero diverted to the jejunum the path the stomach's contents travel and permitted continued digestion and elimination of waste from Vo's body. In Dr. Wilson's opinion, the pyloric bypass was in Vo's best interest and the risk of a leak to the repair to the duodenum would have been higher had the bypass not been performed. In addition, he stated the risk of bleeding from the gastrojejunostomy was low.

Furthermore, Dr. Wilson opined the biopsy was "a worthy goal." The biopsy could possibly determine whether the ulcer was secondary to Vo's chronic inflammatory disease. If it was, it would have called for a change in Vo's medication program.

Dr. Wilson testified the second surgery was necessary and waiting would have meant more blood loss, more transfusions, and further deterioration of Vo's condition. The second surgery was not the result of any failure on Dr. Guerrero's part in performing the initial surgery. Dr. Guerrero checked the sutures to the duodenum and those used in the gastrojejunostomy. There was no bleeding from either site.

In the third surgery, Dr. Guerrero found some oozing at the site of the gastrojejunostomy and a leak at the site of the pyloric closure. Wilson opined the latter

9

leak was "a consequence of poor healing more than anything else" and Vo's "underlying illness [was] responsible for this deterioration." In his opinion, had the pyloric exclusion not been performed, the leak would have been even more serious.

Dr. Wilson's testimony was reasonable, credible, of solid value, and supports the jury's verdict (*United Professional Planning, Inc. v. Superior Court*, *supra*, 9 Cal.App.3d at p. 393), Dr. Gordon's contrary testimony notwithstanding. (*Crawford v. Southern Pacific Co.*, *supra*, 3 Cal.2d at p. 429 ["When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court."].) Accordingly, we affirm the judgment.

## III

## DISPOSITION

The judgment is affirmed. Dr. Guerrero is entitled to his costs on appeal.


MOORE, ACTING P. J.

WE CONCUR:


ARONSON, J.


IKOLA, J.

10