Filed 11/25/14  Hines v. Premier Power Renewable Energy CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DAVID HINES, | |
| Plaintiff and Respondent, | G049912 |
| v. | (Super. Ct. No. CIVDS1017426) |
| PREMIER POWER RENEWABLE ENERGY, INC., | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of San Bernardino, Brian S. McCarville, Judge.  Affirmed and remanded.

Acker & Whipple, Stephen Acker and Leslie Anne Burnet for Defendant and Appellant.

Law Offices of Thomas N. Jacobson and Thomas N. Jacobson for Plaintiff and Respondent.

A jury awarded David Hines $58,977.03 against his former employer Premier Power Renewable Energy, Inc. (Premier). The trial court denied Premier's motion for a judgment notwithstanding the verdict (JNOV) and motion for new trial. After denying Premier's motion to tax costs, the court awarded Hines $9,267.64 for costs and $122,378 for attorney fees. On appeal, Premier maintains the judgment must be reversed because the verdict contains internally inconsistent findings and there was insufficient evidence to support the verdict and the amount of damages awarded. Premier asserts the court erred in denying its motion for nonsuit, admitting into evidence exhibit No. 89, denying the JNOV, denying the motion for new trial, denying the motion to tax costs and granting Hines's motion for attorney fees. Finding all the contentions lack merit, we affirm the judgment and remand the matter for the trial court to determine the amount of attorney fees recoverable by Hines in this appeal.

I

Premier sells and installs solar panels on residential homes and commercial structures. In April 2008, Premier hired Hines to expand its sales of solar panels in Southern California. Initially, he was the only employee making sales for the company in the Southern California territory.

The parties executed a contract titled, "Premier . . . incentive compensation plan for Southern California sales manager/solar consultant 2008" (capitalization omitted; hereafter, the Agreement). The "Introduction" to the contract provided, "The following incentive [c]ompensation plan offered to . . . Hines for a [s]olar [c]onsultant position is effective from [April 14, 2008,] and expires on [December 31, 2008,] to encourage superior sales performance. The minimum quota for each [s]olar [c]onsultant will be $2 million in total booked sales for each year the plan is in effect. The goal for each [s]olar [c]onsultant will be [$]3 million per year."

The Agreement next provided a "[g]eneral description" of the incentive compensation plan. This section began with the following statement: "This is an At-Will

2

agreement and may be terminated at any time, without cause, by either party." The paragraph then described the nature of and schedule for commission payments. "A current [s]olar [c]onsultant will only receive a commission after the initial down payment and the first progressive payment equal to or greater than 25 [percent] of the total cost of [the] system has been received, 50 [percent] of the total commission is due and payable the next pay period after the deposit and the [first] progressive payment have been made. The remaining 50 [percent] of commission will be due and payable as described in the [c]ommission [i]nstallments section of this compensation plan. Commission earnings are based on the total sales price generated from sales of products, after applying discounts/charge back, if any. [Premier] will provide leads to [the s]olar [c]onsultant as they become available at no charge to the consultant."

Under the terms of the Agreement, Hines was to receive an annual base salary of $35,000. "For all single sales of $300,000 to $700,000 the following commission rates" applied: (1) a 5 percent "base commission rate" for sales up to $300,000; (2) a possible 3 percent commission rate for sales between $300,000 to $700,000 unless it was "a commercial sale over 36kWDC"; (3) "[u]p to 1 [percent] override on all sales other than personal sales in Arizona, San Bernardino, Riverside and [Los Angeles] counties depending on the margin"; and (4) "[a] possible 1 [percent] commission on 'self generated leads[.]'" The Agreement further explained, "An active [s]olar [c]onsultant will become eligible for benefits when a total of $375,000[] of booked sales is achieved." It defined a booked sale as having a $1,000 down payment and a first "progressive payment equal to or greater tha[n] 25 [percent] of the total cost of [the] job and the rescission date has passed."

The Agreement provided there would be "charge backs" for cancellations. "Any sales contract canceled for any reason, and 1) the [c]ompany has not been paid in full, or 2) there is a refund due to the customer, the [s]olar [c]onsultant's commission for

3

the canceled sale will be deducted from the [s]olar [c]onsultant's [c]ommission [e]arnings at the same commission rate that was paid."

Premier terminated Hines from his employment on March 9, 2009. He filed a wrongful termination complaint on December 27, 2010, alleging the following: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) "violation of public policy" as expressed in the Labor Code, i.e., nonpayment of wages; (4) intentional infliction of emotional distress (IIED); and (5) an accounting. In addition, Hines requested attorney fees and punitive damages with respect to the second and third causes of action.

Hines attached a copy of the Agreement to his complaint and explained that in addition to a base salary of $35,000 per year plus commissions, he "was to be paid a portion of what was referred to as 'overages.'" He alleged, "Overages were amounts received by . . . Premier, in excess for the sales goals for each project." Hines stated that from April 2008 to January 2009 he was told by his superiors that his performance was exemplary. In early 2009, Hines was told he was being "terminated due to poor performance and failure to make appointments." Hines claimed this was simply untrue.

Premier moved to strike the punitive damages allegations from the complaint. The trial court granted the motion with respect to the second cause of action (breach of the implied covenant of good faith and fair dealing), and denied the motion with respect to the third cause of action (violation of public policy pursuant to the Labor Code).

Before trial, the parties submitted trial briefs. In his brief, Hines alleged that before working for Premier, he and his wife were both employed and supported their two young daughters. They decided to give up their jobs based on Premier's representation the company was offering Hines "a lifetime career path." Hines explained he was promised many things, some of which were included in the Agreement (discussed above). Hines explained other things were orally promised by Premier's president,

4

Dean Marks, such as "[a]n overage equal to 50 [percent] on all sums included in the sales price above the company's estimate or goal for the sale of the job."  In addition, Hines knew Premier was "planning to go public" and he would be "gifted stock in the corporation."

In his trial brief, Hines explained he began working for Premier from his home because Premier did not have an office for him.  He used his own resources to pay for many business expenses.  In May 2008 he hired Mark Markovich to assist him, and they worked together from Hines's home.  Hines stated he worked long hours.  He was a top sales performer.

Hines explained that when he was given an opportunity to study for and take the contractor's exam for solar contracting, he asked Marks if this would benefit Premier.  Marks encouraged him to take the exam.  In the fall of 2008, Hines noticed Premier was not paying him correctly and asked about it.  Around this same time, he passed the contractor's exam and began to feel "snubbed by upper management" and deprived of leads.  Premier began having meetings with Markovich and without him.  Hines received a letter in March 2009 stating he was being terminated due to poor work performance.  After being discharged, Hines went into business for himself, but he did not solicit Premier's customers for his own business.

Premier's trial brief stated Hines was an "at-will" employee who could be terminated at any time and without cause.  It asserted, however, Hines was fired for good cause because he engaged in misconduct and did not perform his job duties.  Specifically, he began setting up his own solar panel installation company in October 2008 and failed to carry out his job duties for Premier.  It claimed Hines missed a mandatory company meeting, missed three sales appointments, and failed to timely provide a client with a bid.  Premier asserted it did not breach the Agreement because Hines was paid everything he was owed.  It reasoned Hines was not entitled to commissions that became available after his termination.

5

At trial, Premier moved to exclude any argument or evidence Hines could collect commissions due to cancelled contracts. The court denied the motion.

During the trial, the parties presented evidence supporting the statements made in the trial briefs. In addition, Hines presented evidence there were numerous problems with the solar panel installations that directly affected his commissions. Specifically, the company was unable to timely install the panels and often installed them incorrectly. Many discontented customers cancelled their contracts or refused to provide good referrals.

Markovich testified he no longer worked for Premier and now owned his own solar panel business. He explained that customer referrals were very important and estimated 85 to 90 percent of his work was referral business. He opined a job could be completed in 35 to 40 days but it took Premier months to complete their installations. Markovich also testified that six months before Hines was terminated, Premier stopped giving Hines good leads. The company executives held meetings without Hines and steered work away from him. Markovich testified Carl Marino told him to rewrite contracts written by Hines so he would not be paid.

Hines presented evidence he was not paid all the amounts owed to him. Hines presented evidence Premier's employee handbook provided that after six months, employees were entitled to receive 80 vacation hours per year. The handbook also specified an employee's final paycheck would include unused vacation pay. Hines was not paid for unused vacation time.

Hines prepared exhibit No. 89 to help the jury calculate damages for unpaid commissions, overrides, and overages. He testified exhibit No. 89 contained a list of all his solar panel sale contracts. Hines stated he was not seeking commissions with respect to customers who cancelled within their three-day rescission period or for reasons unrelated to Premier's misconduct. He explained he removed those numbers from his commission calculations. Hines stated he was only seeking payment from sales contracts

6

cancelled because of Premier's negligence.  Hines stated exhibit No. 89 also contained calculations for the overages owed, calculated as the difference between the price of the system and the price of the actual contract.  Hines explained he was promised 50 percent of this additional profit to the company.  And finally, exhibit No. 89 contained a chart titled "Markovich override," representing a summary of the solar panel contracts Markovich obtained, of which Hines was promised 1 percent commission.

The jury was given special verdict forms related to each cause of action, separately titled Part I, II, III, and IV.  Parts I and II referred to the first two causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing.  Part III asked the jury to determine if there was a "nonpayment of wages."  The jury did not indicate an amount of damages in Part I or II of the verdict.  In Part III, it determined Premier owed Hines $1,538.46 for unpaid vacation, $28,443.70 for unpaid "overages," and $28,841.02 for "unpaid commissions."  The final section of the special verdict, Part IV, asked the jury if Hines was entitled to "waiting-time penalty for nonpayment of wages."  (Capitalization omitted.)  On this form, the jury determined Premier willfully failed to pay owed wages for a total of five days, and Hines's daily wage rate was $153.85 per day.

Premier moved for JNOV, a new trial, and to tax Hines's costs.  The trial court denied these motions and granted Hines's motion for attorney fees, awarding $122,378.  The court determined Hines could not collect prejudgment interest and ordered him to prepare a judgment.  The court entered the final judgment on January 3, 2013, for $58,977.03 in damages, $122,378 for attorney fees, and $9,267.64 for costs.

II

A. *Were There Inconsistent Special Verdicts?*

Premier contends the judgment must be reversed because the jury returned inconsistent special verdicts on the three causes of action.  It is wrong.

7

"A special verdict is inconsistent if there is no possibility of reconciling its findings with each other. [Citation.] If a verdict appears inconsistent, a party adversely affected should request clarification, and the court should send the jury out again to resolve the inconsistency. (Code Civ. Proc., § 619; [citations].) If no party requests clarification or an inconsistency remains after the jury returns, the trial court must interpret the verdict in light of the jury instructions and the evidence and attempt to resolve any inconsistency. [Citations.] [¶] On appeal, we review a special verdict de novo to determine whether its findings are inconsistent. [Citation.] With a special verdict, unlike a general verdict or a general verdict with special findings, a reviewing court will not infer findings to support the verdict. [Citations.] ""'Where the findings are contradictory on material issues, and the correct determination of such issues is necessary to sustain the judgment, the inconsistency is reversible error.'" [Citations.]' [Citation.] 'The appellate court is not permitted to choose between inconsistent answers. [Citations.]' [Citation.] The proper remedy for an inconsistent special verdict is a new trial. [Citation.]" (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 357-358, fn. omitted.)

Hines's case focused on three causes of action, breach of contract, breach of the covenant of good faith and fair dealing, and nonpayment of wages in violation of public policy.[1] The parties prepared separate special verdict forms as to each claim, labeled Part I, II, and III, respectively. Premier asserts the jury's findings on the third claim (Part III) awarding damages, was inconsistent with its finding with respect to the other forms (Part I and II) for which the jury did not specify damages. We will address each verdict form separately, beginning with the third claim on which the jury based its damage award.

---

[1] The IIED claim was dismissed during trial.

8

*i. Nonpayment of Wages*

With respect to the wage claim, the trial court instructed the jury with a version of CACI No. 2700 (essential factual elements) modified only to insert the correct party names. The court instructed as follows: "Hines claims that [Premier] owes him unpaid wages. To establish this claim, . . . Hines must prove all of the following:

"1. That . . . Hines performed work for [Premier];

"2. That [Premier] owes . . . Hines wages *under the terms of the employment*; and

"3. The amount of unpaid wages. [¶] 'Wages' includes all amounts for labor performed by an employee, whether the amount is calculated by time, task, piece, commission or some other method." (Italics added.)

The special verdict form pertaining to unpaid wages, called Part III, asked the jury about each of the above essential factual elements, as follows: (1) "Did . . . Hines perform work for [Premier]?"; and (2) "Does [Premier] owe . . . Hines wages, including vacation pay and/or unpaid overages (PAR), under the terms of the employment?" The jury answered "yes" to these two questions. The last question of Part III asked the jury "What is the amount of unpaid wages?" Next to the word "vacation" the jury entered the amount $1,538.46. The jury filled in the sum of $28,443.70 next to the word "overages." And finally, the jury determined the amount of "unpaid commissions" was $28,841.02.

*ii. Breach of Contract*

With respect to the breach of contract action the court instructed the jury using a modified version of CACI No. 303, as follows: "To recover damages from [Premier] for breach of contract, . . . Hines must prove all of the following:

"1. That . . . Hines and [Premier] entered into a contract;

"2. That . . . Hines did all, or substantially all, of the significant things that the contact required him to do or that he was excused from doing those things;

"3. That . . . Hines was harmed by that failure."

9

We note the original version of CACI No. 303 delineates two additional elements of proof. In addition to Nos. 1 and 2 above, CACI No. 303 requires proof "[3. That all conditions required by the contract for [name of defendant]'s performance [had occurred/[or] were excused];] [¶] [4. That [name of defendant] failed to do something that the contract required [. . . it] to do; and] [¶] [or] [¶] [4. That [name of defendant] did something that the contract prohibited [ . . . it] from doing; . . .]."

Element 3 is used when the conditions for performance are at issue because if such conditions have been excused or performed, the respective duties of the parties may be affected. Element 4 relates to the element of breach, i.e., the unjustified or unexcused failure to perform a contract. In this case, the jury was not instructed on these two elements.

The special verdict form pertaining to the breach of contract claim (called Part I) proved problematic for the jury. Part I asked the jury to answer the following questions, and instructed, "[i]f you answered no [to any question], go to Part II."

"1. Did . . . Hines and [Premier] enter into a contract? [¶] Yes___ No___ [¶] . . . [¶]

"2. Did . . . Hines do all, or substantially all, of the significant things that the contract required him to do? [¶] Yes___ No___

"or

"Was . . . Hines excused from having to do all or substantially all, of the significant things that the contract required him to do? [¶] Yes___ No___ [¶] . . . [¶]

"3. Did all the conditions that were required for [Premier's] performance occur or were they excused? [¶] Yes___ No___ [¶] . . . [¶]

"4. Did [Premier] fail to do something that the contract required it to do?" [¶] Yes___ No___ [¶] . . . [¶]

"5. Was . . . Hines harmed by that failure? [¶] Yes___ No___ [¶] . . . [¶]

"6. "What are . . . Hines's damages? [¶] TOTAL:_____"

10

The jury answered "yes" to the first two questions, concluding the parties entered into a contract and Hines did all, or substantially all, of the significant things that the contract required him to do. It left blank the question asking if Hines was excused from having to do all the things required under the contract. Thus, the jury found no issue with respect to Hines's performance or his obligations under the contract. As directed by the modified jury instruction (CACI No. 303), Hines could recover for breach of contract if these two elements were satisfied (and if there was evidence of harm).

The third question in Part I asked the following compound question: "Did all the conditions that were required for [Premier's] performance occur *or* were they excused?" (Italics added.) The jury answered, "No." It cannot be assumed the jury answered "no" to whether the conditions occurred or "no" to the issue of excuse. This question should have been broken into two parts as was done with question No. 2. In question No. 2, the jury was asked about Hines's performance separately from whether his nonperformance was excused. Thus, if the jury had determined Hines failed to perform his duty under the contract, it could separately answer if his obligation was excused.

Contrary to Premier's contention, the jury's response to question No. 3 was not necessarily a finding in its favor. If the jury determined "no" the conditions did not occur then Premier's duty did not become due and there could be no breach. If, however, the jury determined the conditions occurred and there was "no excuse" that would suggest the jury determined the contract required Premier to perform. Under this interpretation, the jury should have continued answering the other questions listed in Part I regarding breach and damages. However, the jury followed the directions that instructed it to stop after answering "no" and proceed to Part II. We conclude the jury's answer of "no" to the two-part question renders the special verdict form ambiguous (not inconsistent).

11

We recognize Premier helped prepare the forms and made no objection they were incomplete or ambiguous before or after the jury was discharged. Hines argues the failure to object to the forms *before* the jury is discharged may forfeit any ambiguity or insufficiency in the verdict. (*Jensen v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, 131.) "However, waiver is not automatic, and there are many exceptions. [Citations.] [¶] Waiver is not found where the record indicates that the failure to object was not the result of a desire to reap a 'technical advantage' or engage in a 'litigious strategy.' [Citation.]" (*Woodcock v. Fontana Scaffolding & Equip. Co.* (1968) 69 Cal.2d 452, 456, fn. 2. (*Woodcock*).) We have no such evidence here and will not deem the issue forfeited.

"[W]here no objection is made before the jury is discharged, it falls to 'the trial judge to interpret the verdict from its language considered in connection with the pleadings, evidence and instructions.' [Citations.] Where the trial judge does not interpret the verdict or interprets it erroneously, an appellate court will interpret the verdict if it is possible to give a correct interpretation. [Citations.] If the verdict is hopelessly ambiguous, a reversal is required, although retrial may be limited to the issue of damages. [Citations.]" (*Woodcock, supra,* 69 Cal.2d at pp. 456-457.)

In this case, the trial court was never told there were ambiguities in the jury verdict forms before they were given to the jury. The issue of ambiguity was not raised in Premier's motion for new trial. Rather, Premier argued the jury's responses were *inconsistent.* In the motion, Premier argued the jury affirmatively determined Premier "fulfilled its contractual obligations." The trial court correctly rejected this argument. It is plain from the jury verdict forms that the jury *never answered the question*, "Did Premier breach the contract?" Indeed, the jury's response of "no" to question No. 3 related to the issue of the preconditions for Premier's performance, not whether Premier fulfilled its obligation under the contract. Because the issue was not raised or decided in the lower court, the correct interpretation of the jury's answers in Part I of the special

12

verdict form falls upon us to consider in the first instance. (*Woodcock, supra,* 69 Cal.2d at pp. 456-457.)

We conclude the verdict form is not hopelessly ambiguous because it is possible to give a correct interpretation based on the pleadings, evidence and instructions. (See *Woodcock, supra,* 69 Cal.2d at pp. 456-457.) The pleadings and evidence alleged Premier made both written and oral promises to Hines concerning compensation. The Agreement addressed the terms of Hines's base salary, commission rate, and calculation of overrides. The employee handbook addressed the issue of vacation pay. Hines alleged he was orally promised stock, overages, and other production bonuses. The instructions stated that to prove breach of a contract (oral or written) Hines need *only* prove there was a contract, he substantially performed all his obligations under the contract, and he was harmed. The jury answered these three questions in the affirmative in Parts I and III. The two verdict forms can be reconciled because Part I asks if there was a breach of the terms of employment and Part III asked the jury to calculate wages due "under the terms of the employment." The damages for Parts I and II would be the same.

We conclude the correct interpretation of the jury's "no" response in Part I, question No. 3 is that the conditions to Premier's performance took place and there were "no" excuses. Thus, the jury determined Premier breached its promise to pay wages but was instructed to specify damages in Part III of the verdict form.

### iii. Breach of the Covenant of Good Faith and Fair Dealing

The above analysis regarding Part I applies equally to the jury's answers in Part II (concerning the breach of the covenant of good faith and fair dealing). As with Part I, the special verdict form contained a compound question about the preconditions required for Premier's performance. However, the jury's response of "no," when read in conjunction with the record and Part III, can correctly be interpreted as making a factual finding in Hines's favor.

13

With respect to this claim, the trial court instructed the jury with a modified version of CACI No. 325, as follows: "In every contract or agreement there is an implied promise of good faith and fair dealing. This means that each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract; however, the implied promise of good faith and fair dealing cannot create obligations that are inconsistent with the terms of the contract. [Hines] claims that [Premier] violated the duty to act fairly and in good faith. To establish this claim, [Hines] must prove all of the following: [¶] 1. That . . . Hines and [Premier] entered into a contract; [¶] 2. That . . . Hines did all, or substantially all, of the significant things that the contract required him to do or that he was excused from having to do those things; [¶] 3. That all conditions required for [Premier's] performance had occurred; [¶] 4. That [Premier] unfairly interfered with . . . Hines's right to receive the benefits of the contract; and [¶] 5. That . . . Hines was harmed by [Premier's] conduct."

The special verdict form (Part II) asked the jury to answer the following questions: (1) "Did . . . Hines and [Premier] enter into a contract?"; (2) "Did . . . Hines do all, or substantially all, of the significant things that the contract required him to do?"; [¶] (3) "Did all the conditions that were required for [Premier's] performance occur or were they excused?"; (4) "Did [Premier] unfairly interfere with . . . Hines's right to receive the benefits of the contract?"; (5) "Was . . . Hines harmed by [Premier's] conduct?"; and (6) "What are . . . Hines's damages?"

As with the breach of contract claim (special verdict form Part I), the jury answered "yes" to the first two questions finding there was a contract and Hines did not breach the contract. It answered "no" to the compound question of whether there was a nonoccurrence of a condition or whether there was an excuse. We adopt by reference our above discussion of the case law and analysis of ambiguous verdicts. Once again, we hold the verdict form in Part II can be correctly interpreted when read in conjunction with

14

pleadings, evidence, instructions, and the jury's determination in Part III that Premier owed Hines damages related to a breach of the covenant of good faith and fair dealing.

B. *Was the Evidence Sufficient to Support the Verdict?*

Premier challenges the sufficiency of the evidence to support the jury's verdict awarding (1) unpaid commissions, (2) unpaid overages, (3) unpaid vacation pay, and (4) the waiting-time penalty. Premier first argues there could not possibly be evidence in the record to support the jury's award of any damages because the jury determined there was no breach of contract. This argument is based on the faulty premise the jury found in Premier's favor on the first two causes of action. As discussed above, we have interpreted the jury's verdict as finding in Hines's favor on all causes of action. Accordingly, this argument on appeal is unpersuasive. We will address Premier's separate challenges to each category of damages below.

*i. Unpaid Commissions*

With respect to unpaid commissions, Premier recognized the $28,841 jury award could have been based on several different theories of recovery. Hines presented evidence he was owed a 5 percent commission on solar panel contracts he directly obtained. He presented evidence this totaled $92,050. Hines also asserted he was owed a 1 percent override on solar panel contracts obtained by Markovich. He calculated he was owed $13,466 in overrides. Hines estimated he was owed $52,600 for commissions lost when Premier cut back on giving him leads to new customers. To calculate his total damages he added the above sums (plus $40,845 owed for overages discussed in the next section) and subtracted $109,509 (his pay as reflected in his W-2 tax forms generated by Premier for 2008 and 2009).

Premier argues there was no evidence it owed Hines money for unpaid commissions pursuant to the Agreement's terms. It first points to evidence Hines was terminated for cause. It does not explain how this relates to the issue at hand. It points to nothing in the Agreement or handbook stating an employee could not collect owed

15

commissions if terminated for cause. This argument is irrelevant. And due to the utter lack of any case authority or legal analysis, we deem it waived. It is incumbent upon an appellant to present relevant legal authority and reasoned argument on each point made, otherwise, the argument may be deemed waived. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785 (*Badie*).)

Second, Premier attacks Hines's reliance on four *cancelled* solar panel contracts. It notes the Agreement plainly stated commissions would not be paid on cancelled contracts. Premier concludes, "The only way the jury could have ever awarded unpaid commissions on canceled sales was to affirmatively find there was a breach of the [covenant of] good faith and fair dealing, and it did not do so." As noted above, this argument fails because we have construed the verdict to find the jury did find a breach occurred.

Third, on appeal Premier discusses evidence proving customers cancelled their contracts for reasons other than improper and untimely installations. In essence, Premier is attempting to reargue the issue of whether it breached the covenant of good faith and fair dealing. It focuses on cancelled contracts involving customers having the last names, Agarwal, Kelly, Handzel, and Devine.[2]

Specifically, it asserted there was evidence "Mr. Agarwal" cancelled his contract because of Hines, and not because of Premier's poor performance. It maintains there was no evidence the "Kelly contract" was sent to Premier before it was cancelled. Premier stated the evidence showed "customer Handzel" never said she wished to cancel due to Premier. Premier did not discuss any of the evidence with respect to the "Devine's contract" other than to say it was cancelled.

---

[2]     The parties do not mention the customers' first names. We recognize Premier's former chief financial officer, Teresa Kelley, has a similar last name as one of the customers. To avoid confusion, we will refer to the customer Kelly as the "Kelly contract."

"'When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact.' [Citations.]" (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 (*Foreman*).) The judgment is presumed to be correct. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.) Moreover, we must presume "'the record contains evidence to sustain every finding of fact. [Citations.]'" (*Foreman, supra,* 3 Cal.3d at p. 881.) It is Premier's burden to demonstrate that it does not. (*Ibid.*)

It is well settled that to meet this burden, Premier had the duty to fairly summarize all the facts in the light most favorable to the judgment. (*Foreman, supra*, 3 Cal.3d at p. 881.) And the burden to provide a fair summary of the evidence "grows with the complexity of the record. [Citation.]" (*Western Aggregates, Inc. v. County of Yuba* (2002) 101 Cal.App.4th 278, 290.)

The record in this case is very complex. The testimony heard by the jury spans five volumes of reporter's transcripts (it exceeds 10,000 pages). There are also eight volumes (2,053 pages) of appellant's appendix. Premier provided copies of approximately 180 exhibits. Nevertheless, Premier has provided only a brief summary of the trial evidence, and its summary consists of facts supporting only its defense.

As aptly noted by Hines in the respondent's brief, the issue of unpaid commissions and the covenant of good faith and fair dealing was hotly disputed at trial and Hines presented a great deal of evidence supporting his claims. Hines complains that Premier, on appeal, has "taken great liberty to provide information out of context." We agree. One clear example of this is Premier's portrayal of the Agarwal contract. Premier claims the evidence proved this contract was cancelled due to Hines's conduct, not due to Premier's negligence. To support this claim, it cites to the one favorable piece of

17

evidence: Hines testified he remembered Agarwal mentioned in an e-mail he wanted to cancel his contract in June 2008 "based on [his] experience with . . . Hines."

Premier omits all the other material evidence regarding the Agarwal contract. It skips over the fact Hines also testified the Agarwal contract was not actually cancelled in June. Hines presented evidence (exhibit Nos. 9 & 10) showing Agarwal decided to continue with the contract based on his discussion with a Premier employee and Agarwal did not actually cancel the contract until October 2008 and, at that time, cited problems relating to the installation process. In an e-mail dated October 27, 2008, Agarwal complained the company took roof measurements in August 2008 and the project was to be completed by October 26, 2008. Agarwal grumbled he had "not heard from" Premier since August. When all the material evidence on this issue is considered, it would be reasonable for the jury to infer Agarwal cancelled the contract in October due to Premier's negligence and not because of Hines.

By not mentioning or discussing all the relevant testimony and exhibits, Premier has left it for us to figure out why Agarwal's many e-mails would not support the jury's conclusion. However, it is not our job to construct theories or arguments that would undermine the judgment. We must presume the record contains evidence to sustain every finding of fact and presume the judgment is correct. (*Foreman, supra,* 3 Cal.3d at p. 881.)

Respondent's brief is full of other examples showing Premier failed to present in its appeal a true picture of the material evidence presented at trial. Hines explains the record contains facts, not mentioned by Premier, that support the jury's determination of damages. Premier's decision to recite only its own evidence is not a fair summary for purposes of determining whether any inferences drawn by the jury were reasonable and supported by substantial evidence. (*Foreman, supra,* 3 Cal.3d at p. 881.) We conclude Premier's failure to set forth all material evidence waives the issue on appeal. (*Ibid.*)

18

Premier's next challenge to the unpaid commission award also fails. It argues exhibit No. 89 shows the alleged commissions owed for customers Handzel, Devine, Kelly, and Agarwal totaled $11,497, and the jury returned a verdict of $28,841. Premier boldly asserts the difference between these two amounts is not supported by any evidence in the record. Not so. In his briefing, Hines correctly points out that Premier's argument fails to acknowledge there was other evidence of unpaid commissions. Exhibit No. 89 demonstrated he was not paid commissions owed on other sale contracts (in addition to the four customers Premier singled out). And, as stated above, the commission award encompassed not only 5 percent for direct sales, but also 1 percent for overrides and additional damages incurred when Premier starved Hines of customer leads during his final few months of employment.

We recognize Premier also challenges the evidence supporting these latter two sources of commissions (overrides and damages for lost leads). As we now explain, these contentions also lack merit.

First, Premier attacks Hines's claim for damages arising from lost leads by discussing all the contrary evidence Premier presented at trial proving there was no misconduct. Once again, Premier cites only to its own evidence and omits any mention of Hines's evidence on this issue. Premier is not entitled to a second trial. It fails to appreciate our standard of review. We must look only at the evidence supporting the judgment and disregard evidence to the contrary. (*Campbell v. Southern Pacific Co.* (1978) 22 Cal.3d 51, 60.) It was Premier's burden to demonstrate the evidence was not sufficient to support the judgment. And to satisfy this burden, Premier was required to set forth in its brief all material evidence upon the point, not merely its own. (*Foreman, supra,* 3 Cal.3d at p. 881.) "'Unless this is done the error is deemed to be waived.' [Citations.]" (*Id*. at pp. 881-882.) We conclude the argument is waived and assume the evidence supports the judgment.

19

Second, Premier offers a great many arguments regarding the other possible component of the unpaid commission award, i.e., overrides. It recognized the Agreement specified Hines would receive, "Up to 1 [percent] override on all sales other than personal sales in Arizona, San Bernardino, Riverside[,] and [Los Angeles] counties depending on the margin." Hines testified he calculated the amount of overrides in exhibit No. 89 by using all of Markovich's sales from May 20, 2008, to March 7, 2009, using a spread sheet provided by Markovich. Premier asserts there is a whole host of problems with Hines's evidence and it presented these argument to the jury during the trial. It concludes, "If some portion of the jury's award of 'unpaid commission' was intended to include amounts for 'overrides,' then there is no substantial evidence to support *that portion* of the award." (Italics added.)

Premier's conclusion goes to the heart of the problem. The special verdict does not answer the question as to what portion, if any, of the $28,841 unpaid commission award "was intended to include amounts for 'overrides.'" If we were to assume for the sake of argument that the jury agreed with all of Premier's arguments at trial regarding overrides, and it rejected Hines's request for $13,466 in overrides, we still would have no grounds to disturb the verdict. The jury's award of unpaid commissions could have been based entirely on the calculations for the 5 percent commission rate allegedly owed for Hines's direct sales (total amount requested $92.050) and/or damages for commissions lost during the last four months of employment (total amount requested $52,600). Either of these two sums standing alone could account for the $28,841 the jury calculated for unpaid commissions. The jury appears to have discounted some accounts

20

and calculated its own figure for unpaid commissions. We will not speculate the award included overrides.[3]

### ii. Unpaid Overages

Hines testified that before the Agreement was executed he was promised he would be paid overages. In exhibit No. 89 he designed a chart showing that for each of his customers there was a "PAR price," representing the solar panel sale price based on Premier's pricing model. He explained the solar panel system was supposed to be sold at this price. The chart also showed the price of the actual contract. This sum ranged from several hundred to thousands of dollars more than the PAR price depending on the customer. Hines explained Premier promised to pay him 50 percent of this additional profit for each contract. He calculated he was owed $40,845 for overages. The jury awarded much less, calculating $28,443 for overages.

It is undisputed the promise to pay overages is not contained in the Agreement. Premier argues evidence of an oral agreement to pay overages was improperly admitted extrinsic and/or parol evidence. We conclude Premier misunderstands the nature of these legal concepts. "The test of admissibility of *extrinsic evidence* to explain the meaning of a written instrument is . . . whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible. [Citations.]" (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37, italics added.) It was Hines's theory there was an oral contract to pay overrides *in addition* to the promises made in the Agreement. The evidence was not intended to explain the meaning of the Agreement.

---

[3] Premier devotes a few sentences to arguing the jury's commission award should not have included Hines's claim for $11,000 in bonuses. This argument fails for the same reason as the overrides issue. Because the jury was not asked to delineate the basis for its award, we will not speculate bonuses were included. There was substantial evidence of other sources for the unpaid commission award.

As for the admissibility of parol evidence, the test is well established as follows: "To the extent a contract is integrated, the parol evidence rule precludes the admission of evidence of the parties' prior or contemporaneous oral statements to contradict the terms of the writing, although parol evidence is always admissible to interpret the written agreement. [Citation.]" (*Esbensen v. Userware Internat., Inc.* (1992) 11 Cal. App.4th 631, 636-637.) Premier does not allege the Agreement was a fully integrated written agreement. It does not provide case authority or legal analysis on this point.[4] We have reviewed the Agreement, and it does not explicitly provide the parties intended for the Agreement to represent a complete employment package or the entire agreement between the parties. To the contrary, the Agreement outlined an incentive plan for a defined term of over eight months (April 2008 to December 2008) and did not purport to represent all the terms of Hines's employment with Premier. Moreover, an oral agreement to pay overages was not admitted to contradict the terms of the Agreement but rather was evidence of *an additional* sales incentive plan.

Premier adds it was error to admit evidence of an oral agreement because there was no cause of action for breach of an oral contract. It provides no case authority or legal analysis on this point. Premier does not assert the issue was raised below, or considered by or ruled upon by the trial court. It does not explain why it should be decided in the first instance by this court. We deem the contention waived. (See *Badie,*

---

[4] "If a writing is intended by the parties as a 'complete and exclusive statement of the terms of the agreement' (see Code Civ. Proc., § 1856, subd. (b)), the contract is 'fully' or 'completely' integrated and parol evidence is inadmissible even to add terms not inconsistent with the writing. Obviously, such a determination must be based on proof of the parties' intent [citation] and a critical element in that proof is the nature of the alleged consistent oral understanding. [Citation.] The Supreme Court has held that in order to bar evidence of a consistent oral understanding, the court must convince itself at a minimum that such an understanding would not 'naturally' have been excluded from the writing. [Citation.]" (*Esbensen, supra,* 11 Cal.App.4th at p. 637, fn. omitted.)

22

*supra,* 67 Cal.App.4th at pp. 784-785 [appellant must present relevant legal authority and reasoned argument on each point made]; *Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 545-546 (*Mansell*) [it is not the proper function of Court of Appeal to search the record on behalf of appellants or to serve as "backup appellate counsel"]; *Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979 (*Kim*) [appellate court not required to consider points not supported by citation to authorities or record].)

Premier argues no jury instructions were given to determine overages. It does not explain the relevance of this fact. Nor does it address the significance or relevance of the other instructions apparently given to address the oral agreement for overages. The jury was instructed, "Contracts may be written or oral. [¶] Contracts may be partly written and partly oral. [¶] Oral contracts are just as valid as written contracts." (CACI No. 304.) It was also instructed regarding implied in fact contracts (CACI No. 305), and modification of written contracts (CACI No. 313). Premier does not address why these instructions were insufficient or inadequate for the jury to determine overages. It does not assert it objected to the jury instructions, notified the trial court about its concerns, or that this is an appropriate issue for appellate review in the first instance. An appellate court is not required to consider points not supported by citation to authorities or record. (*Kim, supra,* 17 Cal.App.4th at p. 979.) We deem this issue also waived. (*Badie, supra,* 67 Cal.App.4th at pp. 784-785; *Mansell, supra,* 30 Cal.App.4th at pp. 545-546.)

Premier's remaining arguments regarding overages appear to be the same unsuccessful ones made at trial. Premier cited to evidence it claims proves there was no agreement to pay overages, Hines was not part of the overages program, Hines was not eligible for the program because he was hired to be a manager and not a sales consultant, Hines used the wrong forms and untimely requested overages, and Hines's calculations were unreliable. Once again, Premier has presented only favorable evidence supporting its theory of the case and it fails to mention the evidence presented by Hines during trial

23

on these same issues. We therefore deem his point waived and assume the evidence supports the judgment. (See *Foreman, supra*, 3 Cal.3d at p. 881.)

### iii. Vacation Pay

Under the title, "Employee Benefits" the employee handbook explains Premiere offers its employees vacation. "[Premier] recognizes the need for balance in an employees' work life and personal life. Paid vacation is to promote and increase productivity and a healthy morale through rest and relaxation. [¶] All regular employees working 32 hours or more hours per week on a regular basis are eligible for paid vacation." The handbook simply states employees having six months to three years of service will earn 80 vacation hours.

The handbook cautions that earned vacation hours must be taken prior to the next anniversary date. "There is no carryover of vacation hours into the following anniversary year." It was undisputed Hines did not use any of his vacation hours. The handbook promised that after termination of employment, "[i]n your final paycheck, you will receive pay for all hours worked up through your last day of employment in addition to any unused earned vacation." It was undisputed Premier did not include in Hines's final paycheck any money for unused earned vacation.

At trial, Hines asserted he was owed $4,977. He explained he calculated this sum based on his salary and commissions. He admitted the employee manual did not describe how vacation pay would be calculated. Hines began working April 4, 2008, and was terminated on March 10, 2009. Premier contends because there was no evidence Hines intended to take a vacation, his "hours would have lapsed before he could have used them, but for the fact of his termination." It also argues there was no evidence to support the sum requested by Hines, or the $1,538.46 awarded by the jury. It concludes the award appears arbitrary, further supporting its argument there is no substantial evidence to support the award of vacation pay. We disagree.

24

Hines presented evidence of his base salary and average commission pay, and calculated the value of 80 vacation hours. Premier did not present evidence to contradict Hines's premise these sums are used to calculate vacation pay for employees. It presents no legal authority to support the notion an employee should not be paid accrued vacation time if he is fired before he takes a vacation. The employee manual does not specify how the 80 hours vacation time is calculated, and Premier did not present evidence on this issue. Therefore, it was up to the jury to decide what a reasonable hourly rate was for the unused vacation time that the employee manual promised would be in the final paycheck.

The jury calculated Hines was owed significantly less than what he requested and awarded $1,538.46. In the absence of any evidence to the contrary, this figure could be based on 80 hours and a more conservative estimate of commission pay. It could be based on less vacation hours but at a higher salary/commission combination. In either case, because Hines presented evidence of his base salary and commissions it cannot be said there was insufficient evidence to support the jury's verdict.

### iv. Waiting-Time Penalty

Part IV of the special verdict asked the jury to answer questions about the Labor Code penalties for the failure to timely pay wages. The jury answered, "Yes" to the following questions: (1) did Hines "perform work for" Premier?; (2) did Premier discharge Hines?; and (3) did Premier "willfully fail to pay the full amount of wages earned by . . . Hines on his last day of employment?"

The jury responded "Days: 5" in response to the special verdict's question, "For how many calendar days following . . . Hines's last day of employment did Premier . . . willfully fail to pay the full amount of . . . Hines's wages?" It determined Hines's daily wage rate at the time of his employment was $153.85.

25

Labor Code section 203[5] provides that if an employer fails to pay the full amount of wages, "the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid [but for no longer] than 30 days."

Premier argues "there is no willful failure to pay wages if the employer and employee have a good faith dispute as to whether and when the wages were due." It asserts there was a good faith disagreement about commissions and overages. Noticeably absent from the analysis is any mention of the unpaid vacation hours. Premier does not assert theses sums were not paid in good faith. It fails to cite to any evidence it had a good reason to believe absolutely no vacation hours accrued during Hines's first year of employment. This evidence is sufficient, standing alone, to support the jury's verdict there was a willful failure to pay wages. Vacation is a form of wages. (*Suastez v. Plastic Dress-Up Co.* (1982) 31 Cal.3d 774, 779 ["It is established that vacation pay is not a gratuity or a gift, but is, in effect, additional wages for services performed"].) We find no error.

*C. Should Nonsuit Have Been Granted?*

On appeal, Premier asserts it "moved for nonsuit at the end of Hines's opening statement because he had not identified sufficient facts to make out a cause of action for breach of written contract with respect to the claim for commissions." It explains the motion was based on the theory the written contract did not provide for "commissions earned after such time as the consultant is actively employed" and Hines waited two years after leaving his employment to seek unpaid commissions. Premier argued the trial court improperly denied the nonsuit motion on the grounds there was not an integration clause in the Agreement.

To support this argument, Premier discusses the terms of the Agreement. It concluded Hines "did not suggest sufficient evidence to show he would be entitled to

---

[5]     All further statutory references are to the Labor Code, unless otherwise indicated.

26

recover commission or overages on sales which were 'booked' upon the receipt of customer payments after he left Premier . . . ." It added, Hines did not allege the Agreement was amended to provide for "commissions on cancelled contracts, commissions due after he was terminated, contracts paid for after he left Premier, and overages, which he freely admitted were not part of the written contract."

This argument fails because it is not an accurate description of what occurred in the trial court. Premier's counsel made an oral motion for nonsuit after the jury heard Hines's and Premier's opening statements. Premier's counsel stated there were two aspects to the motion. First, there was no evidence to support the third cause of action for a violation of public policy. Second, "[T]here is a contract, which clearly traverses the provisions of which that would bar the claims that there was some sort of other commission scheme that [Hines was] entitled to commissions at all after he left and counsel has not illuminated any sort of a basis for saying the contract was entered into under fraud, duress, or the writing is not valid and binding." Counsel concluded under the parol evidence rule counsel had not stated a cause of action for breach of the written contract.

Hines's counsel responded the Agreement was prepared by the employer and it does not contain an integration clause. He argued there was no reason an employee could not introduce evidence about the other part of the employment package "which would be the part that relates to overages and some of the other items." Hines's counsel did not address the issue of whether the contract was breached by Premier's failure to pay commissions "booked" after he left.

Hines's counsel next addressed the challenge to the third cause of action (violation of public policy). After Premier's counsel replied to arguments about the third cause of action, the trial court asked for additional briefing regarding that issue. The court denied the motion for nonsuit as to the contract action, stating, "The opening statement indicated there was an employment contract, however, there is not an

27

integration clause such to the effect that there was parol [evidence] or there is an argument or any suggestions there is going to be parol evidence that the written document was not everything so I think that is well covered in the opening statement so that is denied."

"Section 581c of the Code of Civil Procedure authorizes a motion for nonsuit after plaintiff's opening statement. In ruling on the motion, the court must accept as true all facts set forth in the statement and indulge in every legitimate inference that may be drawn from such facts. [Citation.] Granting a motion for nonsuit at this stage is a disfavored practice and will be upheld only where it is clear plaintiff's counsel has stated all facts he expects to prove and such facts do not constitute a cause of action. [Citation.]" (*Sturgeon v. Curnutt* (1994) 29 Cal.App.4th 301, 305 (*Sturgeon*).) We find no error.

In the opening statement Hines's counsel asserted there was a written agreement that contained only part of the compensation package. Counsel told the jury there were "other items" not included in the Agreement and because the Agreement did not have an integration clause it must be viewed as only part of the terms of employment. He argued, "The other part that was very significant that was included in it is there was something called overages and . . . Hines and others will explain to you how that worked." Counsel stated there were various documents and other references made to the "overage issue" and Hines was not paid for overages. Simply stated, Hines alleged in the opening statement that extrinsic evidence would be used to add to the promises made in the written agreement (because it does not have an integration clause). Hines's counsel explained it was Hines's theory the nonpayment of overages was a breach of the contract as modified.

"In ruling on the motion, the court must accept as true all facts set forth in the statement and indulge in every legitimate inference that may be drawn from such facts. [Citation.]" (*Sturgeon, supra,* 29 Cal.App.4th at p. 305.) Hines's counsel stated

28

facts he expected to prove and those facts constituted a viable cause of action. Nonsuit on the breach of contract claim was properly denied.

## D. *Should the Trial Court Have Excluded Exhibit No. 89*

As described in some detail above, exhibit No. 89 contained Hines's calculations for his commissions, overrides, and overages earned during his employment. The exhibit contains three pages of tables and each of these pages lists customer names and sums of money depending on the element of damages. The final page of the exhibit contained Hines's summary of the evidence gathered from the other three pages. During Hines's testimony, counsel asked questions about exhibit No. 89 and what documents he used to calculate each element of his alleged damages. Premier did not object to use of the exhibit during the trial.

After both parties rested, but before the jury was instructed, the parties discussed Hines's many exhibits. Premier's counsel stated he objected to the admission of exhibit No. 89. Before the trial court ruled, Hines's counsel offered to submit an amended version of exhibit No. 89, based on more accurate calculations. Counsel suggested, "Since we completed the case, one of the things that we did is we recalculated the items that were on the original number 89. [The original] was prepared from documents he kept in the ordinary course through his employment to some extent with regard to the commissions and the overage split and Markovich's overrides and, of course, the last page consists of a summary of the various damages." Counsel stated the updated document could be admitted, after which both parties could present argument or Hines could seek to reopen and identify the document and its contents. Hines stated the document represented Hines's testimony and would help the jury deliberate because the jury will not have to "paw through each contract." Counsel argued the documents were reliable because the figures are "subject to verification by the contracts which form the basis of it, and also with regard to the W-2 forms, which have been identified and stipulated to going into evidence."

29

Premier argued the exhibit was "a good demonstrative exhibit," but it should not be deemed admissible evidence. Premier's counsel argued Hines conceded during the trial that were multiple errors in his calculations. Counsel stated it was unclear where many of the figures came from, and the evidence was unreliable.

The trial court ruled, "I think it is an admissible piece of evidence save the last page, which . . . compiles the three pages over again." The court stated it would remove page four because it was argumentative.

On appeal, Premier asserts exhibit No. 89 lacked foundation and reliability. It maintains, "There was no satisfactory explanation at trial of the source of all the figures in exhibit No. 89, particularly those on page three regarding overages." Premier notes Hines testified he was referred to the "pricing module" and customers described in documents contained in exhibit No. 4. Premier asserts some of the customer names were not contained in exhibit No. 4 (but does not tell us which ones). It also points out Hines testified he relied on an Excel chart, but it was not introduced as an exhibit. Premier concludes that based on these facts, the trial court improperly overruled its objection to admission of the exhibit. On appeal, Premier adds a few new arguments not raised below. It contends Hines's reliance on a spreadsheet obtained from Markovich renders exhibit No. 89 hearsay evidence that should have been excluded. Premier does not explain its failure to raise the hearsay issue below. Nevertheless, it concludes the trial court should have excluded it on this basis.

More importantly, Premier does not cite to a single case or legal treatise to support its argument the court erred in admitting exhibit No. 89. There is no mention of the standard of review, the basis for the court's ruling, or whether there is legal authority supporting exclusion of demonstrative evidence. It is incumbent upon an appellant to present relevant legal authority and reasoned argument on each point made, otherwise, the argument may be deemed waived. (*Badie, supra,* 67 Cal.App.4th at pp. 784-785*; Mansell, supra,* 30 Cal.App.4th at pp. 545-546 [it is not the proper function of Court of

30

Appeal to search the record on behalf of appellants or to serve as "backup appellate counsel"]; *Kim, supra,* 17 Cal.App.4th at p. 979 [appellate court not required to consider points not supported by citation to authorities or record].) We deem the issue waived.

*E. Should the Trial Court Have Granted the JNOV?*

With respect to our review of the JNOV ruling, Premier correctly provides case authority regarding our standard of review. "The trial court's power to grant a motion for JNOV is the same as its power to grant a directed verdict. (Code Civ. Proc., § 629.) The court must accept as true the evidence supporting the jury's verdict, disregarding all conflicting evidence and indulging in every legitimate inference that may be drawn in support of the judgment. The court may grant the motion only if there is no substantial evidence to support the verdict. [Citations.] On appeal from the denial of a motion for JNOV, we determine whether there is any substantial evidence, contradicted or uncontradicted, supporting the jury's verdict. [Citation.]" (*Tognazzini v. San Luis Coastal Unified School Dist.* (2001) 86 Cal.App.4th 1053, 1057-1058.)

On appeal, Premier asserts that "[f]or the reasons discussed above in sections I through IV" of the appellate brief, there was "no substantial evidence to support the jury's award of damages against Premier." It adds there cannot be evidence to sustain the award of damages because the jury found no breach of contract or of the covenant of good faith and fair dealing. Premier then summarizes the arguments raised in section I through IV. We need not rehash the same arguments. We have rejected all of Premier's arguments on appeal regarding the sufficiency of the evidence alleged in sections I through IV, and interpreted the special verdict as finding Premier was liable for breaches warranting damages. The trial court properly denied the JNOV.

*F. Should the Trial Court Have Granted the New Trial Motion?*

Premier asserts the new trial motion was improperly denied because the jury's verdict was fatally inconsistent and "against the law." Earlier in this opinion, we determined the jury's responses on the special verdict forms were ambiguous, not

31

inconsistent. Based on the pleadings, evidence, instructions, and other portions of the verdict forms, we reconciled and interpreted the jury's responses on the forms as finding in favor in Hines. We find no error with respect to the trial court's denial of the new trial motion.

## G. *Should the Motion to Tax Costs Have Been Granted?*

Hines's memorandum of costs requested in addition to filing, jury, and court reporting fees, $2,212 for deposition costs, $350 for service of process, $747 for attachment expenses, and $360 for exhibits. It requested a total of $9,267.64. Premier filed a motion to tax costs attacking the jury fees, service of process for David Kerdoon, attachment expenses, and deposition costs related to Teresa Kelley, who did not testify. Hines filed an opposition, and the court ruled in his favor awarding the exact sum he requested ($9,267).

On appeal, Premier narrows the argument to two particular costs it found offensive. First, it complains Kelley's deposition testimony (costing $670) was irrelevant because she did not testify at trial. Premier asserts Hines's counsel purchased an airline ticket the day before departing and therefore paid an unnecessarily high price of $435 to fly to Sacramento. In addition, the court awarded the cost of a hotel stay in conjunction with the deposition. Premier argues counsel could have purchased the ticket 10 days in advance when it would have been much less expensive. Second, Premier challenges the court's refusal to subtract the $75 fee for service of a trial subpoena upon Kerdoon because Hines did not list him as a witness for trial.

"Whether a cost item was reasonably necessary to the litigation presents a question of fact for the trial court and its decision is reviewed for abuse of discretion. [Citation.]" (*Ladas v. California State Auto. Assn.* (1993) 19 Cal.App.4th 761, 774.) Noticeably absent from Premier's brief, is any discussion of the evidence presented in Hines's opposition to the motion to tax costs. With respect to the cost of Kelley's deposition, Hines explained she was Premier's chief financial officer at the time he was

terminated.  She left the company after Hines and he was unsure about the reasons why she relocated.  Moreover, it was unclear if she would be called as one of Premier's witnesses because she was the person responsible for accounting of overages and other compensation.  Hines's counsel believed that to adequately prepare for trial, the nature of Kelley's testimony must be determined.  However, finding a day to take Kelley's deposition proved difficult and travel arrangements could not be made until she gave some assurance she would appear.  She was very uncooperative.

Hines also offered evidence regarding Kerdoon, one of Premier's disgruntled customers.  Hines explained Kerdoon had also sued Premier and subpoenaed Hines to testify in his case.  Hines planned to use Kerdoon as a rebuttal witness because he could confirm Premier's negligence in installing the solar panels.  Hines stated it "became unnecessary because of the press to finish the trial and the statements made by . . . Marks during his testimony.  A valid subpoena was issued and communications were maintained with his counsel in the event he was needed to testify."

The above evidence, cited in Hines's opposition, is likely what the trial court relied upon in making its ruling.  Premier does not suggest the evidence was false or unreliable.  Indeed, it makes no mention of it.  We find no reason why the court could not have relied on it because it adequately explained why the costs requested were reasonable.  It cannot be said the court abused its discretion in denying the motion to tax costs.

## H.  Should the Trial Court Have Awarded Attorney Fees?

As a general rule, a successful plaintiff can recover attorney fees only when they are provided for by statute or by agreement of the parties.  (Code Civ. Proc., § 1021; *Davis v. Air Technical Industries, Inc*. (1978) 22 Cal.3d 1, 5.)  On appeal, Premier challenges the trial court's determination Hines was entitled to attorney fees pursuant to section 218.5.  It asserts the court abused its discretion in awarding attorney fees.  It is wrong for several reasons.

33

Ordinarily, a trial court's determination that a litigant is a prevailing party and its award of costs and fees is reviewed for abuse of discretion. However, the issue in this case is whether the statute applies to Hines's lawsuit. The interpretation of section 218.5 and its application to the circumstances in this case are questions of law, subject to independent review on appeal. (See, e.g., *City of Lafayette v. East Bay Mun. Utility Dist.* (1993) 16 Cal.App.4th 1005, 1013.)

"Pursuant to established principles, our first task in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. In determining such intent, a court must look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. A construction making some words surplusage is to be avoided. The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible. [Citations.] Where uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation. [Citation.] Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent. [Citations.]" (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386-1387.)

Section 218.5 provides in relevant part: "In any action brought for the nonpayment of wages, fringe benefits, or health and welfare or pension fund contributions, the court shall award reasonable attorney[] fees and costs to the prevailing party if any party to the action requests attorney[] fees and costs upon the initiation of the action. . . . This section shall not apply to an action brought by the Labor Commissioner. This section shall not apply to a surety issuing a bond pursuant to . . . the Business and Professions Code or to an action to enforce a mechanics lien brought under . . . the Civil

34

Code.  [¶] . . . This section does not apply to any cause of action for which attorney[] fees are recoverable under [s]ection 1194 [actions to recover minimum wage and overtime compensation]."

On its face, the statute applies to this case.  Hines's action was primarily brought for the nonpayment of wages and benefits (including commissions, overages, and vacation pay).  The first cause of action alleged "substantial losses in earnings, bonuses, and job benefits."  The second cause of action alleged that as a direct result of Premier's breach of the covenant of good faith and fair dealing, Hines "has lost substantial employment benefits . . . including . . . lost wages[] and other employee fringe benefits."  The third cause of action alleged violations of Labor Code statutes relating to "the timely compensation of employees."  The prayer requested these wage-related damages and attorney fees.

On appeal, Premier suggests Hines's request for attorney fees under section 218.5 was based on one claim—the waiting-time penalty under section 201—and not on the other wage-related causes of action.  It then argues the $122,378 attorney fees award was unreasonable in relation to the $769 damages recovered for the Labor Code violation.  We find this argument misrepresents the record.

Hines's attorney fees motion was brought under section 218.5 and was based on *all* claims relating to unpaid wages and benefits.[6]  In Hines's motion and supporting attorney declaration, Hines explained he was not seeking fees relating to

_____

[6]     Premier misstates the record by arguing Hines's motion for attorney fees did not specify section 218.5, and that he only mentioned section 201 as the basis for recovery of fees.  Premier complains Hines first mentioned section 218.5 in its reply brief to the opposition.  Nonsense!  The *face page* of the "notice of motion and motion for attorney[] fees" clearly states, "Hines, will move the court for an order for attorney[] fees *pursuant to . . . section 281.5*."  (Italics added.)  The attached memorandum of points and authorities explained Hines was seeking attorney fees for all matters relating to the timely payment of wages, which included all causes of action except the one for emotional distress.  It mentioned the first two causes of action *in* addition to section 201 (the third cause of action).

35

the discovery and work done on his claim for emotional distress. Hines's attorney declared "less than" 10 percent of his time "was expended on matters not relating to the timely payment of wages." Hines argued, "The bulk of discovery was concentrated on Premier's failure to pay [Hines] everything owed at the time of his termination. The awards for breach of contract and breach of the covenant of good faith and fair dealing are predicated on the failure of Premier to pay [Hines] on or before the termination date wages owed . . . ." Hines added the 10 percent deduction was "more than generous to Premier," especially since the IIED was based on the fact Premier did not pay wages owed. This argument lacks merit. We conclude the $122,378 attorney fees award was reasonable in relation to the $58,977 for wage-related damages.

In addition, Premier argues the attorney fees should have been apportioned because under section 218.5 the prevailing party may only recover fees on statutory causes of action. It cites authority holding, "'When a cause of action for which attorney fees are provided by statute is joined with other causes of action for which attorney fees are not permitted, the prevailing party may recover only on the statutory cause of action.'" (*Bell v. Vista Unified School Dist.* (2000) 82 Cal.App.4th 672, 686-687.)

Premier reasons attorney fees "were not recoverable under any of the causes of action of the complaint" because none involved violations of statutes permitting attorney fees. It explains the Agreement did not contain an attorney fees clause and so fees were not recoverable for the first two causes of action and the tort claims would not support the recovery of fees. It notes no fees were requested with respect to the accounting claim, and in any event, that issue was not litigated. Premier argues, "[T]he basis upon which Hines sought recovery of attorney[] fees was section 218.5, which was not even specifically alleged in his complaint. . . . Rather, the [third cause of action] contains a brief allusion to 'violation of the public policy as expressed in the California *Labor Code* that specifically prohibits any improper withholding of compensation earned.' . . . What the claim for violation of public policy boiled down to was an

36

instruction . . . regarding a waiting-time penalty for non-payment of wages." Premier asserts this claim was a nominal part of the case and Hines spent very little time litigating that issue. Premier concludes the trial court should have apportioned the attorney fees award to time spent on the waiting-time penalty from time spent litigating claims for which fees are not recoverable. It is wrong.

It appears Premier is suggesting on appeal that section 218.5 only applies to Hines's causes of action alleging Labor Code violations, and this was the only basis for the attorney fees motion. It provides no supporting case authority for this theory, and we have determined it is not a correct statement of the law. "If an employer fails to pay wages in the amount, time, or manner required by contract or by statute, the employee has two principal options. The employee may seek judicial relief by filing an ordinary civil action against the employer for breach of contract and/or for the wages prescribed by statute. (§§ 218, 1194.) Or the employee may seek administrative relief by filing a wage claim with the [California Labor Commissioner] pursuant to a special statutory scheme . . ." commonly known as a "Berman" hearing. (*Cuadra v. Millan* (1998) 17 Cal.4th 855, 858, italics omitted, disapproved on another ground in *Samuels v. Mix* (1999) 22 Cal.4th 1, 16, fn. 4.)

Section 218.5 expressly applies to "any action" based on the nonpayment of wages or benefits. "Any action" would include claims for breach of contract and breach of the covenant of good faith and fair dealing. If the Legislature had intended to exclude contract-related claims from the reach of section 218.5, it could have easily and expressly done so. Notably, the Legislature expressly specified section 218.5 is inapplicable to actions brought by the California Labor Commissioner, to a surety issuing a bond, to an action to enforce a mechanic's lien, and to an action for which attorney fees are recoverable under section 1194. (See *Earley v. Superior Court* (2000) 79 Cal.App.4th 1420, 1427 ["Section 218.5 entitles the prevailing party, in *any* action for 'wages,' to a *mandatory* award of costs and attorney fees"].) In summary, section 218.5 permitted

37

Hines to recover attorney fees on all claims except his tort causes of action. In his motion, Hines stated he apportioned 10 percent of his attorney fees to the litigation of the tort claims, and the rest related to his efforts to recover wages (for which fees were recoverable). The trial court agreed this was a proper apportionment and we find no reason to disturb its ruling.

We wish to briefly address Premier's comment Hines could not seek attorney fees under section 218.5 because it was not alleged in the complaint. Once again, it cites no authority to support this contention. We conclude the argument is meritless. Section 218.5 has no such requirement. Rather, it simply provides attorney fees are available "if any party to the action requests attorney[] fees and costs upon the initiation of the action." (§ 218.5.) Hines's complaint prayed for attorney fees. And since his first three causes of action all sought damages for unpaid wages and benefits, we conclude the complaint adequately placed Premier on notice of potential liability for Hines's attorney fees under section 218.5.

*I. Was the Issue of Punitive Damages Properly Before the Jury?*

Before trial, Premier moved to strike Hines's claims for punitive damages as to the second and third causes of action. The trial court granted the motion as to the second cause of action (breach of the covenant), but not the third (violation of public policy due to Labor Code violations regarding timely payment of wages). On appeal, Premier argues this ruling was incorrect. It concludes, "Had the motion . . . been granted, the jury would not have been given any instruction regarding a waiting time penalty, and the damages for such a penalty would not have been awarded. Therefore, the trial court's

38

denial of Premier's motion to strike the punitive damages as to the [f]ourth [c]ause of [a]ction was prejudicial error."[7]

This argument is mystifying because the jury did not award punitive damages, it was not instructed on punitive damages, and such damages were not part of the final judgment. We suspect Premier has confused the term "punitive damages" with the statutory "penalty" imposed for nonpayment of wages and authorized by section 203. That section provides the employer will pay a penalty if the employer willfully fails to pay wages. (§ 203 ["wages of the employee shall continue as a penalty" until employer pays owed wages].) Premier did not move to strike the penalty allegation, and we cannot construe the court's ruling on the motion to strike *punitive damages* as having anything to do with a statutorily mandated penalty. There is no ruling for us to review on this issue.

*J. Should Hines be Entitled to Recover Attorney Fees on This Appeal?*

The law is well established that a statute authorizing the recovery of attorney fees in the trial court also authorizes the recovery of attorney fees incurred on appeal unless the statute specifically provides to the contrary. (*Morcos v. Board of Retirement* (1990) 51 Cal.3d 924, 927.) Such an award is authorized even where the only issue on appeal is the propriety of the fee award made in the trial court. (*Del Cerro Mobile Estates v. Proffer* (2001) 87 Cal.App.4th 943, 951.) Accordingly, we conclude Hines may recover attorney fees incurred in defending against this appeal in an amount to be determined by the trial court.

---

[7]      We will assume this last statement contains a typographical error regarding the cause of action because punitive damages were not alleged with respect to the fourth cause of action for emotional distress. Premier's motion did not relate to the fourth cause of action.

III

The judgment is affirmed. Respondent shall recover his costs and attorney fees on appeal. The matter is remanded to the superior court to determine the amount of attorney fees recoverable on appeal by respondent Hines.


O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


FYBEL, J.

40